# OPERATING AGREEMENT

# OF

# LORSTAN PHARMACEUTICAL, LLC

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I. | DEFINITIONS; CONSTRUCTION | 1 |
| 1.1 | Definitions | 1 |
| ARTICLE II. | ORGANIZATION | 1 |
| 2.1 | Organization | 1 |
| 2.2 | Name | 2 |
| 2.3 | Term | 2 |
| 2.4 | Registered Agent and Office | 2 |
| 2.5 | Principal Office | 2 |
| 2.6 | Qualification in Other Jurisdictions | 2 |
| ARTICLE III. | NATURE OF BUSINESS | 2 |
| 3.1 | Purpose; Powers | 2 |
| ARTICLE IV. | ACCOUNTING AND RECORDS; FISCAL YEAR | 3 |
| 4.1 | Accounting, Books, and Records | 3 |
| 4.2 | Accounts | 4 |
| 4.3 | Company Funds | 4 |
| 4.4 | Fiscal Year | 4 |
| ARTICLE V. | NAMES, ADDRESSES, AND UNITS OF MEMBERS | 4 |
| 5.1 | Names, Addresses, and Units | 4 |
| ARTICLE VI. | RIGHTS AND DUTIES OF MEMBERS | 4 |
| 6.1 | Delegation of Authority | 4 |
| 6.2 | Members' Standard of Care | 5 |
| 6.3 | Voting | 5 |
| 6.4 | Meetings | 5 |
| 6.5 | Liability of Members | 7 |
| 6.6 | Representations and Warranties | 7 |
| 6.7 | Duties of Members | 7 |
| ARTICLE VII. | MANAGEMENT OF THE COMPANY | 7 |
| 7.1 | The Board of Representatives | 7 |
| 7.2 | Meetings of the Board; Quorum and Voting Requirements | 8 |

7.3 Actions of the Board ....... 9
7.4 Limitation of Liability, Compensation, Reimbursement, and Expenses ....... 9
7.5 Related Party Transactions ....... 10
ARTICLE VIII. CONTRIBUTIONS AND CAPITAL ACCOUNTS ....... 10
8.1 Contributions of Members ....... 10
8.2 Distribution of Assets ....... 11
8.3 Compliance with Section 704(b) of the Code ....... 11
8.4 Borrowings and Loans ....... 11
8.5 Other Matters ....... 11
ARTICLE IX. CAPITALIZATION ....... 12
9.1 Capitalization ....... 12
9.2 Voting Rights ....... 12
ARTICLE X. ALLOCATIONS AND DISTRIBUTION ....... 12
(a) Allocations of Net Profits and Net Losses from Operations ....... 12
10.2 Priority Allocations ....... 12
10.3 Change in Interest ....... 13
10.4 Curative Allocation ....... 13
10.5 Tax Allocations ....... 13
10.6 Interim Distributions ....... 13
ARTICLE XI. LIABILITY, EXCULPATION, AND INDEMNIFICATION ....... 14
11.1 Liability ....... 14
11.2 Duties and Liabilities of Covered Persons ....... 14
11.3 Indemnification ....... 15
11.4 Expenses ....... 15
11.5 Insurance ....... 16
ARTICLE XII. DISPOSITION OF MEMBERSHIP INTERESTS AND OTHER MEMBER OBLIGATIONS ....... 16
12.1 Disposition by Members ....... 16
12.2 Prohibitions on Disposition ....... 16
12.3 Sales by Members ....... 17
12.4 Tag Along ....... 19

12.5 Notice of Termination ....19
12.6 Noncompliance ....20
12.7 Transferees as Assignees ....20
12.8 Required Assumption of Obligations ....20
ARTICLE XIII. TAXES ....20
13.1 Elections ....20
13.2 Tax Matters Partner ....20
13.3 Method of Accounting ....21
ARTICLE XIV. DISSOCIATION OF A MEMBER ....21
14.1 Dissociation ....21
14.2 Rights of Dissociating Member ....21
ARTICLE XV. ADMISSION OF ASSIGNEES ....21
15.1 Rights of Assignees ....21
15.2 Rights of Substitute Member ....21
ARTICLE XVI. DISSOLUTION AND WINDING UP ....22
16.1 Dissolution ....22
16.2 Effect of Dissolution ....22
16.3 Distribution of Assets on Dissolution ....22
16.4 Winding Up and Certificate of Cancellation ....22
ARTICLE XVII. BUSINESS OPPORTUNITIES ....22
17.1 No Other Obligation ....22
ARTICLE XVIII. AMENDMENT ....23
18.1 Agreement May Be Modified ....23
18.2 Amendment or Modification of this Agreement ....23
ARTICLE XIX. MISCELLANEOUS PROVISIONS ....24
19.1 Entire Agreement ....24
19.2 No Partnership Intended for Nontax Purposes ....24
19.3 Rights of Creditors and Third Parties under Agreement ....24
19.4 Notice ....24
19.5 Counterparts ....24

19.6 Partition ....................................................................................................24
19.7 Governing Law, Submission to Jurisdiction, and Waiver of Jury Trial ..............24
19.8 Remedies ........................................................................................................25
19.9 Severability .....................................................................................................25
19.10 Nondisclosure of Names of Members ...........................................................25

# OPERATING AGREEMENT
# OF
# LORSTAN PHARMACEUTICAL, LLC

This Operating Agreement (the "Agreement") of **LORSTAN PHARMACEUTICAL, LLC**, a Delaware limited liability company (the "Company"), is made as of this 19th day of May, 2016 (the "Effective Date"), by and among the Persons identified on the signature pages hereto as members of the Company and the Persons who become members of the Company in accordance with the provisions hereof.

WHEREAS, the Company was formed as a Delaware limited liability company pursuant to the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, et. seq., (as amended from time to time, the ("Delaware Act") on May 19, 2016; and

NOW, THEREFORE, in consideration of the premises and the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS; CONSTRUCTION

1.1 Definitions. Capitalized terms shall have the meanings specified in Exhibit A or in the Section of this Agreement identified in Exhibit A.

(a) Terms Generally. The definitions in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Unless the context shall otherwise require, any references to any agreement or other instrument or statute or regulation are to it as amended and supplemented from time to time (and, in the case of a statute or regulation, to any successor provisions). Any reference in this Agreement to a "day" or number of "days" (without the explicit qualification of "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice shall be deferred until, or may be taken or given on, the next Business Day.

## ARTICLE II.
## ORGANIZATION

2.1 Organization. The Members hereby agree to operate the Company as a limited liability company pursuant to the provisions of the Delaware Code and upon the terms and conditions set forth in this Agreement.

2.2 Name. The name of the Company is LORSTAN PHARMACEUTICAL, LLC, and all business of the Company may be conducted under that name or under any other name as the Board may elect; provided, that any such name shall contain the words "limited liability company" or the abbreviation "L.L.C.," shall not include the name of a Member without the consent of such Member, and shall otherwise comply with applicable law.

2.3 Term. The Company shall exist in perpetuity until its termination pursuant to Article XIV. The existence of the Company as a separate legal entity shall continue until the cancellation of the Company's Certificate in the manner required by the Delaware Code.

2.4 Registered Agent and Office. The registered agent for the service of process and the registered office shall be that Person and location reflected in the Certificate as filed in the office of the Secretary of State of Delaware. The Board may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State of Delaware. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Board shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, and give notice thereof to the Members. If the Board shall fail to designate a replacement registered agent or change of address of the registered office, any Member may designate a replacement registered agent or file a notice of change of address and shall give notice thereof to the other Members.

2.5 Principal Office. The principal office of the Company (the "Principal Office") shall be located at 10773 NW 58th Street, Suite. 751 Doral, FL 33178. The Board may change the location of the Principal Office to any other place within or without the State of Delaware upon ten (10) Business Days prior notice to each Member, provided that such Principal Office shall be located in the continental United States.

2.6 Qualification in Other Jurisdictions. The Board shall cause the Company to be qualified, formed, or registered to the extent required in any jurisdiction in which the Company transacts business, including under assumed or fictitious name statutes if deemed advisable. The Secretary or a member of the Board, as an "authorized person" within the meaning of the Delaware Code, shall execute, deliver, and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to be qualified to do business in a jurisdiction in which the Company conducts or desires to conduct business.

## ARTICLE III.
## NATURE OF BUSINESS

3.1 Purpose; Powers. The Company is formed solely for the purpose of for-profit development, licensing, exploitation, and commercialization of a pharmaceutical compound identified as a silicone oil based compound, or its derivatives, and any existing or pending patents, which are listed on Exhibit C hereto, as amended from time to time. The Company, and the Board on behalf of the Company, shall have the power and authority to do all things necessary or convenient to accomplish its purposes and operate its business as described in this Article III. The Company exists only for the purpose specified in this Article III and may not conduct any other business without the consent of the Board and the Majority of the Members.

## ARTICLE IV.
## ACCOUNTING AND RECORDS; FISCAL YEAR

4.1 Accounting, Books, and Records.

(a) The Board shall cause the Company to maintain at its Principal Office separate books of account for the Company which (i) shall fully and accurately reflect all transactions of the Company, all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with the method of accounting used by the Company and this Agreement and (ii) shall include all documents and other materials with respect to the Company's business as are usually entered into and maintained by Persons engaged in similar businesses. The Company and its subsidiaries shall continue to use the cash receipts and disbursements method of accounting in preparation of their financial statements and shall keep their books and records accordingly until the Board determines that the Company shall use the accrual method of accounting, in which event the Company and its subsidiaries' financial statements shall be prepared and books of account maintained in accordance with GAAP. Any Member or its designated representative shall have the right, at any reasonable time and for any purpose reasonably related to such Member's interest as a member, (x) to have access to and to inspect and copy the contents of such books or records, (y) to visit the facilities of the Company and its subsidiaries, and (z) to discuss the affairs of the Company and its subsidiaries with their respective officers, employees, attorneys, accountants, customers, and suppliers. Neither the Company nor its subsidiaries shall charge such Member for such examination, but each Member shall bear its own expenses in connection with any examination made for any such Member's account and shall reimburse the Company for reasonable out-of-pocket costs or expenses incurred by the Company in making such books and records available for inspection.

(b) Without limiting the generality of the foregoing, the Company shall maintain the following records at the Principal Office:

(i) A current and a past list, setting forth the full name and last known mailing address of each Member and Representative;

(ii) A copy of the Certificate of Formation of the Company as properly adopted and amended from time to time by the Members and filed with the Secretary of State of Delaware and all Certificates of Amendment thereto, together with executed copies of any powers of attorney pursuant to which any Certificates have been executed (together, the "Certificate");

(iii) Copies of the Company's federal, state and local income tax returns and reports for all years;

(iv) Copies of the then effective Operating Agreement, and all amendments thereto, and copies of any Operating Agreements no longer in effect;

(v) Copies of all financial statements of the Company; and

(vi)    Unless contained in the then effective Operating Agreement, a writing setting out the amount of cash and a statement of agreed value of other Property or services contributed to the Company by each Member.

4.2     Accounts. The Board shall cause to be maintained a record of the Capital Account of each Member in accordance with Article VIII.

4.3     Company Funds. All funds of the Company shall be deposited in the Company's name in such checking, money market, or other account or accounts as the Board may from time to time designate; withdrawals shall be made therefrom on such signature or signatures as the Board shall determine. No commingling of the funds or other assets of the Company with those of any other Person, other than a wholly owned subsidiary of the Company, shall be permitted. The Company shall not lend or advance funds to or guarantee any obligation of a Member or any Affiliate thereof without the prior approval of the Board and as otherwise provided herein.

4.4     Fiscal Year. The fiscal year of the Company shall be the same as the calendar year.

## ARTICLE V.
## NAMES, ADDRESSES, AND UNITS OF MEMBERS

5.1     Names, Addresses, and Units. The name of each Member, the number of Units held by each Member and whether or not such Member is an Assignee are as reflected on Exhibit B attached hereto and by this reference made a part hereof as if set forth fully herein. The Secretary shall be required to update Exhibit B from time to time as necessary to accurately reflect the information required to be stated therein. Any amendment or revision to Exhibit B made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to Exhibit B shall be deemed to be a reference to Exhibit B as amended and in effect from time to time.

## ARTICLE VI.
## RIGHTS AND DUTIES OF MEMBERS

6.1     Delegation of Authority. Each Member acknowledges, agrees to and consents to the delegation of powers and authority to the Board pursuant to this Agreement, to the exercise by the Board of the powers and authority conferred by this Agreement, and to actions and decisions of the Board within the scope of the Board's authority as provided herein, and further agrees that only those Members and agents of the Company who have been expressly authorized by this Agreement or the Board to act on behalf of the Company may do so. Such authorized Members and agents of the Company shall have the authority to bind the Company within the scope of their delegated authority. No Member or agent, other than an authorized Member or agent acting within the scope of its delegated authority, shall have any power or authority to, or shall take any action to, bind the Company. A Member shall be obligated to indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member. Any difference arising as to any matter within the authority of a Member shall be decided by the Board. No act of a Member in contravention of such determination shall bind the Company to Persons having knowledge of such determination.

6.2    Members' Standard of Care. No Member or former Member shall be liable, responsible, or accountable for damages or otherwise to the Company or any Covered Person for any act or omission performed or omitted by such Member or former Member in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on it by this Agreement or the Board, unless such act or omission involved a breach of this Agreement, fraud or a knowing violation of the law, or was the result of willful misconduct or gross negligence. In discharging its duties, a Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports, or statements presented to the Company by any other Person as to matters the Member reasonably believes are within such Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

6.3    Voting.

(a)    All Members (other than Assignees and Members who are Dissociating Members pursuant to Article XIV) shall be entitled to vote on any matter submitted to a vote of the Members.

(b)    Except as specifically provided otherwise herein, whenever the Members are entitled to vote on any matter under the Delaware Code or this Agreement, such matter shall be considered approved or consented to upon the receipt of the affirmative approval or consent, either in writing or at a meeting, of Members having Units in excess of seventy-one percent (71%) of the Units of all Members entitled to vote on the particular matter (a "Majority"). Assignees and Dissociating Members shall not be considered Members entitled to vote for the purpose of determining a Majority. In the case of a Member who has Disposed of all or part of such Member's Units to an Assignee (other than by reason of his death) (such Member, an "Assignor"), the Units of such Assignee shall not be considered in determining a Majority and such Member shall not have the right to vote or consent with respect to such Units; but such Assignor shall be permitted to vote those Units not assigned. The Units of a deceased Member shall be voted by the deceased Member's personal representative for so long as the Units comprise an asset of his estate.

6.4    Meetings.

(a)    Meetings of the Members shall be called by the Secretary at the request of the Board or upon the written request of Members constituting a Majority of the Members. Written notice of any such meeting, which shall state the place, date, and hour of the meeting and the nature of the business to be transacted, shall be given to all Members not less than five (5) days nor more than thirty (30) days prior to the date of such meeting. A meeting may be held at any reasonable place within the continental United States specified in the notice of meeting. Members may vote in person or by proxy at such meeting.

(b)    Such notice may be communicated in person, by fax, or other form of wire or wireless communication, or by mail and shall be effective at the earlier of the time of its

receipt or, if mailed, five (5) Business Days after its mailing. Notice of any meeting of the Members may be waived if the waiver is signed by the Member entitled to notice and is filed with the Company's minutes or records. A Member's attendance at or participation in a meeting waives notice of the meeting, unless the Member objects to holding the meeting or transacting business at the meeting and does not vote or assent to any action taken at the meeting.

(c)     A Member may authorize any Person or Persons to act for him by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or his attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it by written notice given prior to the taking of any action or vote in reliance thereon.

(d)     Any or all Members may participate in a meeting by, or through the use of any means of communication, such as conference telephone, by which all Members participating may simultaneously hear each other during the meeting. A Member participating in a meeting by such means shall be deemed to be present in person at the meeting.

(e)     Any meeting of the Members may adjourn from time to time to reconvene at the same or some other place and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Company may transact any business that might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting. Except as otherwise provided by law or this Agreement, at each meeting of Members the presence in person or by proxy of the holders of a Majority of Units of the Members at the meeting shall be necessary to constitute a quorum. In the absence of a quorum, the Members so present may, by majority vote, adjourn the meeting from time to time in the manner provided above until a quorum shall attend.

(f)     Any action required or permitted to be taken at any meeting of Members may be taken without a meeting if a consent or consents in writing setting forth such action are sent to all Members prior to the effectiveness of the written consent, such consent or consents are signed by those Members entitled to vote thereon holding that number of Units as would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted, and such consent or consents are included in the minutes or filed with the Company's records reflecting the action taken. Such consent or consents shall bear the date of signature of each Member who signs the consent or consents and such consent or consents shall not be effective until the latest of such dates of signature, unless the consent specifies a different prior or subsequent effective date, in which case the action is effective on or as of the specified date. A consent signed under this clause (f) has the effect of a meeting vote and may be described as such in any document.

(g)     Each meeting of Members shall be conducted by the CEO or his or her designee.

6.5 Liability of Members. Except as otherwise provided by the Delaware Code, the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and no Member, Representative, Officer, or Affiliate of a Member shall be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Member, Representative, Officer, or Affiliate of a Member. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Delaware Code shall not be grounds for imposing personal liability on the Board, any Representative, Officer, or Member or Affiliate of a Member for liabilities of the Company.

6.6 Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member that (a) if that Member is an Entity, it is duly organized, validly existing, and in good standing under the law of its state of organization; (b) the Member has full power, authority, and legal capacity to execute and agree to this Agreement and to perform its or his obligations hereunder; (c) the Member is acquiring its or his Membership Interest in the Company for the Member's own account as an investment and without an intent to distribute the Membership Interest; and (d) the Member acknowledges that the Membership Interests have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements and compliance with Article XII.

6.7 Duties of Members. Each Member and its or his Affiliates, in connection with the business and affairs of the Company, and in exercising such Member's discretion under this Agreement, shall to the fullest extent permitted by Section 101.401 of the Delaware Code, be entitled to consider such interests and factors as such Member desires, including its own interest and the interest of its Affiliates, and shall have no duty or obligation to give any consideration to any interest of, or factors affecting, any other Member.

## ARTICLE VII.
## MANAGEMENT OF THE COMPANY

7.1 The Board of Representatives.

(a) The power and authority to manage the Company's business shall be vested in the Board, subject only to any provision of this Agreement expressly requiring the approval of the Members for specified actions. Except as otherwise provided by this Agreement, the Board shall have the full right and authority (acting on behalf of the Members) to manage the business and affairs of the Company. Except as expressly authorized in writing by the Board or this Agreement, no Member or Representative, and no officer, employee, or agent of any Member, shall directly or indirectly act as agent of the Company for any purpose, engage in any transaction, make any commitment, enter into any contract, or incur any obligation in the name of the Company or in any other way hold itself out as acting for or on behalf of the Company, and a Member shall be obligated to indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member or any officer, employee, or agent of such Member. Any attempted action in contravention of the preceding sentence shall

be null and void ab initio, and not binding upon the Company, unless ratified or authorized in writing by the Board.

(b)     The Board shall consist of two (2) individuals (each, a "Representative"). Each initial Member shall have the right to appoint one (1) Representative.

(c)     Each Representative (or Board observer) shall hold office at the pleasure of the Member that appointed such Representative. Any Member entitled to appoint a Representative may at any time and from time to time, by written notice to the Board remove any or all of the Representative appointed by such Member, with or without cause, and appoint a substitute Representative to serve in his stead. Each Member entitled to appoint a Representative shall be entitled to name one or more alternate Representatives to serve in the place of any Representative appointed by such Member should such Representative not be able to attend a meeting or meetings or any portion thereof. Each such alternate shall be deemed to be a Representative hereunder with respect to any action taken at such meeting or meetings or portion thereof.

(d)     If a Representative dies, resigns, is removed or becomes disabled or incapacitated, the Member that appointed such Representative shall promptly appoint a replacement.

(e)     To the fullest extent permitted by law, including Section 101.401 of the Delaware Code, each Representative shall be deemed an agent of the Member that designated such Representative and shall have no duty (fiduciary or otherwise) to any Person other than that Member.

7.2     Meetings of the Board; Quorum and Voting Requirements.

(a)     The Board shall hold regular meetings not less than one (1) times per year, unless the Board unanimously otherwise determines, and shall establish meeting times, dates and places and adopt rules and procedures consistent with the terms of this Agreement. Meetings of the Board may be held at the Principal Office of the Company, or at such other reasonable place in the continental United States as shall be designated in the notice of such meeting. Any business may be transacted, and any Company action may be taken, at any regular or special meeting of the Board at which a quorum is present.

(b)     Meetings of the Board, whether regular or special, shall be convened by a written notice from the Secretary given to all Representatives at least five (5) days prior to the date of the meeting, at their last address as formally notified to the Company and as indicated in the records of the Company. The notice of a Board meeting shall include the date, time and venue, and agenda for the meeting. Attendance by a Representative at, or his or her participation in, a meeting shall constitute a waiver of notice of such meeting and shall be counted as to whether there is a quorum for the meeting, unless such Representative at the beginning of the meeting (or promptly upon his or her arrival) objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting. Notices of meetings of the Board shall be communicated in person, by fax or other form of wire

or wireless communication, or by mail and shall be effective at the earlier of the time of its receipt or, if mailed, five (5) Business Days after its mailing.

(c)     Any Representative may be represented at a meeting of the Board by an alternate designated by proxy, which proxy must be notified to the Board either by letter or facsimile, signed by the Representative giving the proxy, addressed to the attention of the Secretary and delivered at least two (2) hours prior to commencement of the meeting of the Board. Representatives may participate in a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting.

(d)     Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if a written consent to that effect is sent to all Representatives prior to the effectiveness of the written consent and such written consent is signed by the number and identity of Representatives necessary, in accordance with Section 7.2(e) to constitute the action of the Board.

(e)     A duly called meeting of the Board, whether regular or special, will be considered validly constituted when two (2) Representatives are present or represented by proxy.

(f)     The Secretary or, in the absence of the Secretary, a Representative or other individual chosen by the CEO, shall serve as secretary of the Board meetings, and shall draw up the minutes of each meeting, which shall include the names of all those present, the matters considered, and the decisions taken.

7.3     Actions of the Board. Except as set forth elsewhere in this Agreement, any action taken by the Company or the Board may be taken by the approval of a majority of the Managers.

7.4     Limitation of Liability, Compensation, Reimbursement, and Expenses.

(a)     No Covered Person shall be liable, responsible, or accountable for damages or otherwise to the Company or any other Covered Person for any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on it by this Agreement or by the Board, unless such act or omission involved breach of this Agreement, fraud or a knowing violation of the law, or was the result of willful misconduct or gross negligence. In discharging its duties, a Covered Person shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports, or statements presented to the Company by any other Person as to matters the Covered Person reasonably believes are within such Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(b) The Covered Persons shall be entitled to be indemnified by the Company as and to the extent provided in Article XI.

(c) Except as otherwise provided in this Agreement or approved by the Board and set forth in a written agreement between a Member and the Company, no Member or Representative shall receive any compensation for services rendered to or on behalf of the Company, but a Member or Representative shall be reimbursed for all reasonable out-of-pocket expenses incurred by it on behalf of the Company with the approval of the Board (whether before or after such incurrence).

7.5 Related Party Transactions. Any transaction between the Company or any Person controlled by the Company (including any joint venture), on the one hand, and any Member or any Affiliate of any Member or of the Company (each, a "Related Party"), on the other hand (each, a "Related Party Transaction"), shall be on an arm's length basis.

ARTICLE VIII.
CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1 Contributions of Members.

(a) On the date hereof the Members have made the Capital Contributions set forth on Exhibit B.

(b) In addition to the initial Capital Contributions, the Board may determine from time to time that additional contributions are needed to enable the Company to conduct its business. Upon making such a determination, the Board shall give Notice to all Members in writing at least thirty (30) Business Days prior to the date on which such contribution is due. Such Notice shall set forth the amount and purpose of the contribution, and the date on which the additional contribution is due. All such contributions shall be made by the Members proportional to their Units.

(c) In the event any Member fails to make the additional contributions required by Section 8.1, the other Member may contribute the amount of the delinquent Member's additional contribution that is in default. Those Members who elect to contribute shall be entitled to contribute additional amounts in proportion to their Units, or in such other proportions as they may mutually agree. A contributing Member shall treat the amount contributed pursuant to this section as a loan from the contributing Member to the defaulting Member bearing interest at the applicable federal rate secured by the delinquent Member's interest in the Company. Until they are fully repaid, the contributing Members shall be entitled to all distributions to which the delinquent Member would have been entitled, with said distributions being applied first to interest and then to the principal balance of the loan. Notwithstanding the foregoing, no obligation to make an additional contribution pursuant to Section 9.1 may be enforced by a creditor of the Company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditors

8.2 Distribution of Assets. If the Company at any time distributes any of its assets in-kind to any Member, the Capital Account of each Member shall be adjusted to account for that

Member's allocable share (as determined under Article X of the Net Profits or Net Losses that would have been realized by the Company had it sold the assets that were distributed at their respective fair market values immediately prior to their distribution.

8.3 Compliance with Section 704(b) of the Code. The provisions of this Article VIII as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain, and credit pursuant to Article X to have substantial economic effect under the Regulations promulgated under §704(b) of the Code, in light of the distributions made pursuant to Article X and Article XII and the Capital Contributions made pursuant to this Article VIII.

8.4 Borrowings and Loans. If any Member shall lend any monies to the Company (a "Member Loan"), the amount of any such loan shall not (i) constitute an increase in the amount of such Member's Capital Contributions or (ii) be reflected in such Member's Capital Account. No Member shall be required to lend any monies to the Company without its written consent, which consent may be given or withheld in the sole and absolute discretion of such Member. Unless otherwise determined by the Board, Member Loans will be unsecured and the promissory notes evidencing the same shall be non-negotiable and, except with the transfer of such Member's Units, shall not be transferable.

8.5 Other Matters.

(a) No Member shall be entitled to interest on, and no interest will accrue with respect to, any Capital Contribution made by such Member or any balance in its Capital Account.

(b) No Member shall have the right to demand or, except as otherwise provided in Sections 10.6 and 17.3, receive a return of all or any part of its Capital Account or its Capital Contributions or, except as contemplated by Sections 13.1, 13.2, 14.1 and 14.2 of this Agreement, resign or withdraw from the Company prior to the dissolution and winding up of the Company. Under circumstances requiring a return of all or any part of its Capital Account or Capital Contributions, no Member shall have the right to receive Property, other than money, except as otherwise provided in Section 10.6.

ARTICLE IX.
CAPITALIZATION

9.1 Capitalization.

(a) The Company is authorized to issue one class of Unit designated Class A Units. The Class A Units are the only equity securities authorized and issued. The Board may authorize the Company to issue new Units, whether in an existing Class or a new class, or any other Security in the Company. The capitalization of the Company as of the date hereof is as set forth on Exhibit B.

9.2 Voting Rights. Owners of the Units shall have full voting rights.

## ARTICLE X.
## ALLOCATIONS AND DISTRIBUTION

10.1 Allocations of Net Profits and Net Losses from Operations. Except as otherwise provided in this Article X, Net Profits, Net Losses, and other items of income, gain, loss, deduction, and credit of the Company shall be apportioned among the Members in proportion to the numbers of Units held by such Members. Notwithstanding the foregoing Net Profits and Net Losses from sales to medically licensed individuals shall be allocated one tenth percent (0.1%) to John Stanise and ninety-nine and nine tenths percent (99.9%) to Dr. Victor Loria.

10.2 Priority Allocations. The following allocations shall be made in the following order of priority:

(a) *Minimum Gain Chargeback.* Notwithstanding any other provision of this Article X, if there is a net decrease in Company Minimum Gain during any Taxable Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulation §1.704-2(g)(2); provided that a Member shall not be subject to this Section 10.2(a) to the extent that an exception is provided by Treasury Regulation §1.704-2(f)(2)-(5). This Section 10.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation §1.704-2(f) and shall be interpreted consistently therewith.

(b) *Member Nonrecourse Liability Minimum Gain Chargeback.* Notwithstanding any other provision of this Article X except Section 10.2(a), if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Liability during any Taxable Year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Liability (determined in accordance with Treasury Regulation §1.704-2(i)(5)) as of the beginning of the year shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Liability. A Member's share of the net decrease in Member Minimum Gain shall be determined in accordance with Treasury Regulation § 1.704-2(i)(4); provided that a Member shall not be subject to this provision to the extent that an exception is provided by Treasury Regulation §1.704-2(i)(4). This Section 10.2(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation §1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) *Qualified Income Offset.* In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation §1.704-1(b)(2)(ii)(d)(4), §1.704-1(b)(2)(ii)(d)(5) or §1.704-1(b)(2)(ii)(d)(6) resulting in an Adjusted Capital Account Deficit, items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for the Taxable Year) shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulation, the Adjusted Capital Account Deficit of such Member created by such adjustments, allocations or distributions as quickly as possible; provided that an allocation pursuant to this Section 10.2(c) shall be made if and only to

the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 10.2 have been tentatively made as if this Section 10.2(c) were not in this Agreement.  This Section 10.2(c) is intended to comply with the qualified income offset requirement in Treasury Regulation §1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)      *Member Nonrecourse Deductions.*  If any Member bears the economic risk of loss with respect to a Member Nonrecourse Liability, any Member Nonrecourse Deductions for any Taxable Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Liability to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation §1.704-2(i).

10.3     Change in Interest.  In the event there is a change in the respective Pro Rata Portions of Members during a Taxable Year, the items allocated to the Members for each Taxable Year during which there is a change in the respective Pro Rata Portions of Members during the year shall be allocated among the Members in proportion to the Pro Rata Portions during such Taxable Year in accordance with §706 of the Code, using any convention permitted by law and selected by the Board.

10.4     Curative Allocation.  Notwithstanding anything to the contrary in this Agreement, in the event any item is specially allocated pursuant to Section 10.2 hereof, the Net Profits or Net Losses shall be allocated to the Members so that the overall allocations shall be made as nearly as possible in accordance with Section 10.1.

10.5     Tax Allocations.  All items will be allocated for federal income tax purposes in the way such items are allocated to the Capital Accounts of the Members except that the provisions of Section 704(c) of the Code shall be applied to any item attributable to an asset which has a tax basis different from the basis which has been credited to the Capital Account of any Member.

10.6     Interim Distributions.

(a)      From time to time, the Board shall determine in its reasonable judgment to what extent, if any, the Company's cash on hand exceeds the current and anticipated needs of the Company and its subsidiaries including needs for operating expenses, debt service, acquisitions, and reserves.  To the extent such excess exists, the Board may make Distributions of the Net Proceeds Members in proportion to the number of Units held by such Members.  Such Distributions shall be in cash or Property, or partly in both, as determined by the Board. The kind of Property distributed as well as the amount of a Distribution shall be Pro Rata.

(b)      Except to the extent prohibited by Section 101.206 of the Delaware Code or to the extent prohibited by the terms of any document, certificate, agreement or otherwise in connection with a loan to the Company from any Person who is not a Member, the Board shall cause the Company to distribute to the Members, within ten (10) calendar days after the end of each calendar quarter, with respect to such calendar quarter, an amount of cash (a "Tax Distribution") which, in the good faith judgment of the Board, equals (A) the product of (i) the cumulative net taxable income of the Company for such portion of the calendar year ending on

the last day of such calendar quarter, computed under Section 10.1 without regard to the special allocations under Sections 10.1(a)-(b), multiplied by (ii) forty-five (45%), reduced by (B) prior distributions under this Section 10.6(b) with respect to the same calendar year. A Tax Distribution with respect to a calendar quarter shall be made ratably among such Members based the portion of the net taxable income of the Company described in clause (A)(i) for such calendar quarter allocated to each such Member. A distribution otherwise payable to a Member pursuant to this Section 10.6(b) may be pro-rated, as determined in the reasonable judgment of the Board, in the case of any Member who is the holder of Units for less than the entire relevant calendar quarter. Tax Distributions shall be considered advances of (and shall reduce) subsequent distributions to be made to Members under Section 10.6(d). Distributions under this Section 10.6(b) shall have priority over any other distributions under this Section 10.6.

## ARTICLE XI. LIABILITY, EXCULPATION, AND INDEMNIFICATION

11.1 Liability. Except as otherwise provided by the Delaware Code, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

11.2 Duties and Liabilities of Covered Persons.

(a) To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(b) Whenever in this Agreement a Covered Person is permitted or required to make a decision (i) in its "discretion" or under a grant of similar authority or latitude, the Covered Person shall be entitled to consider such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or other applicable law.

(c) Except as expressly provided otherwise in this Agreement, neither the Class F Member nor any of its Affiliates shall have any duties (including fiduciary duties) to any other Member or the Company, and any duties or implied duties (including fiduciary duties) of the Class F Member or any of its Affiliates to the Company or to any other Member that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Delaware Code (including Section 101.401 of the Delaware Code) and any other applicable law; provided, however, that this Agreement shall not limit or eliminate liability for any act or

omission that constitutes a violation of the implied contractual covenant of good faith and fair dealing.

(d) Except as expressly provided otherwise in this Agreement, neither 2013 IPI nor any of its Affiliates shall have any duties (including fiduciary duties) to any other Member or the Company, and any duties or implied duties (including fiduciary duties) of 2013 IPI or any of its Affiliates to the Company or to any other Member that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Delaware Code (including Section 101.401 of the Delaware Code) and any other applicable law; provided, however, that this Agreement shall not limit or eliminate liability for any act or omission that constitutes a violation of the implied contractual covenant of good faith and fair dealing.

11.3 Indemnification. To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement or the Board, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage, or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 11.3 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

11.4 Expenses. To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit, or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 11.3.

11.5 Insurance. The Company may purchase and maintain insurance, to the extent and in such amounts as the Board shall, in its sole discretion, deem reasonable, on behalf of Covered Persons and such other Persons as the Board shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement. The Board and the Company may enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 11.4 and containing such other procedures regarding indemnification as are appropriate.

## ARTICLE XII. DISPOSITION OF MEMBERSHIP INTERESTS AND OTHER MEMBER OBLIGATIONS

12.1 Disposition by Members. No Member may Dispose of all or a portion of its Membership Interest or Units (whether directly or indirectly, voluntarily or involuntarily, or

otherwise) except as otherwise permitted by this Article XII. Subject to Sections 12.4 and 12.11, the following transfers of Membership Interests shall be permitted without such consent:

        (a)     Between and among the Members;

        (b)     By any Member to a Relative of such Member; or to an Entity, the entire beneficial ownership of which is held individually or in the aggregate by, or which benefits, as the case may be, such Member and/or the Relatives of such Member; and

In the event that any Member is not a natural person, by such Member (x) to any of the owners of such Member or to a Relative of any such owner; or (y) to an Entity, the entire beneficial ownership of which is held individually or in the aggregate by, or which benefits, as the case may be, such Member, any of the owners of such Member or the Relatives of any such owner; provided, however, that, a transferee of any Membership Interest transferred pursuant to clauses (a), (b), or (c) of this Section 12.1 must assume the obligations of the transferor thereof.

    12.2    Prohibitions on Disposition.  Except for transfers permitted by Sections 12.1 in no event may any Units, Membership Interests.

        (a)     If such Disposition, alone or when combined with other transactions, would result in a termination of the Company within the meaning of § 708 of the Code;

        (b)     Without an opinion of counsel reasonably satisfactory to the Board, if, in the reasonable discretion of the Board, such opinion is required, that (i) such assignment is subject to an effective registration statement under applicable state and federal securities laws, or (ii) such assignment is exempt from the registration requirements of applicable state and federal securities laws and will not, in light of all other prior and pending transfers of Membership Interests or Units, result in the Company being required to register under Section 12(g) of the Exchange Act; and

        (c)     Unless and until the Company receives from the Assignee the information and agreements that the Board may reasonably require, including any taxpayer identification number and any agreement that may be required by any Taxing Jurisdiction.

    12.3    Sales by Members.

        (a)     Notwithstanding anything in this Article XII to the contrary, if a Member shall receive at any time a bona fide offer in writing (a "Third Party Offer") from an unaffiliated third party (a "Third Party Offeror") that such Member (the "Selling Member") proposes to accept, to acquire all or any portion of the Membership Interest of the Selling Member then the Selling Member shall deliver to each other Member (the "Non-Selling Members") a notice (the "Notice of Sale") containing a true and complete copy of the Third Party Offer (which shall identify the Third Party Offeror and set forth all terms of the offer to purchase, including the number of Units to be purchased (the "First Refusal Interests") and the kind and amount of consideration to be paid therefor), and setting forth the Selling Member's offer to sell to such other Members the First Refusal Interests, for an amount equal to the purchase price specified in and otherwise on the terms and conditions contained in the Third Party Offer, except as otherwise modified hereby. The Notice of Sale shall specify the price at which the First Refusal

Interests are offered as provided in the preceding sentence. The Members shall enter into an appropriate confidentiality agreement reasonably requested by the Selling Member(s) with respect to the terms of any Third Party Offer or other purchase offers disclosed to them pursuant to Article XII. For purposes of this Article XII, any Units sold pursuant to any provisions of this Article XII shall be priced on a per Unit basis.

(b) Each Non-Selling Member shall have the right to elect to purchase all but not less than all of its Pro Rata Portion (calculated on the basis of the ratio of Units) of the First Refusal Interests exercisable by notice given to the Selling Member (with a copy to the Company and each other Member) within twenty (20) days after the Notice of Sale was given (the "Non-Selling Member's Option Period"). In the event that one or more Non-Selling Members do not timely elect to purchase their full Pro Rata Portion of the First Refusal Interests, then each Member that has elected to purchase its full Pro Rata Portion (a "Purchasing Member") shall have the right, exercisable by notice given to the Selling Member (with a copy to the Company and each other Purchasing Member) within the ensuing ten (10) day period (the "Final Non-Selling Member's Option Period"), to elect to purchase all or part of its Pro Rata Portion of the balance of the First Refusal Interests (calculated on the basis of the ratio of the Units held by it to the Units held by all Purchasing Members), or such other proportion of the balance of the First Refusal Interests as the Purchasing Members shall have agreed as so specified in such notices of election to purchase.

(c) In the event that the Non-Selling Members have not timely elected to purchase all and not less than all of the First Refusal Interests, or the purchase of all and not less than all the First Refusal Interest is not consummated within the period specified in this Section 12.3 for any reason other than a breach by the Selling Member of any of its covenants, representations or warranties that are a condition to consummation of such purchase, then, subject to Article XII, the Selling Member shall have the right, at any time during the period of ninety (90) days following the expiration of the last relevant option period (subject to extension for up to sixty (60) days as necessary to obtain required governmental approvals) (the "Offeror Selling Period") to sell all and not less than all the First Refusal Interests to the Third Party Offeror on terms and conditions no more favorable in the aggregate to the Third Party Offeror than those contained in the Notice of Sale and the accompanying Third Party Offer. Prior to the closing of any such sale, the Selling Member shall furnish evidence reasonably acceptable to the Company that the terms and conditions of such sale are no more favorable in the aggregate to the Third Party Offeror than those specified in the Notice of Sale. Subject to compliance with the requirements of this Section 12.3, upon the closing of such sale, the Third Party Offeror shall automatically become a Substitute Member entitled to the rights of a Member hereunder. If the Selling Member does not close the sale to the Third Party Offeror within the applicable ninety (90) day period (as the same may have been extended), the procedures set forth above shall be repeated with respect to any subsequent proposed sale of Units or other Member Obligations to a bona fide third party offeror.

(d) The closing of any sale of First Refusal Interests to the Purchasing Members shall take place on such date as may be agreed to by the parties, which date shall be no later than ninety (90) days after the expiration of the last relevant option period set forth above (subject to extension (x) for up to sixty (60) days as necessary to obtain required governmental approvals and (y) pursuant to the following two sentences) and shall be subject to Article XII. If

at the date scheduled for the closing, any Purchasing Member fails to tender payment for the Units that he or it elected to purchase (the "Forfeited Interests"), then the Purchasing Members, provided that they have tendered payment for the Units that they elected to purchase, shall have the right to purchase all but not less than all of the Forfeited Interests by advising the Selling Member at such scheduled closing of their commitment to purchase such Forfeited Interests and tendering payment therefor in full no later than the second Business Day following such scheduled closing date (the "Forfeited Interests Purchase Date"). In such event, the Selling Member may elect to postpone the closing of the sale of all of the First Refusal Interests to the Forfeited Interests Purchase Date. The right to purchase Forfeited Interests shall be allocated among each Purchasing Member who at the originally scheduled closing tendered payment (or, in the event the originally scheduled closing was postponed pursuant to the immediately preceding sentence, was prepared to tender payment) in full for the Units to be purchased by it and who advised the Selling Member at such scheduled closing of its commitment to purchase at least its pro rata share (determined in accordance with this sentence) of any Forfeited Interests (each, a "Qualified Interests Purchaser") in proportion to the number of Units or Other Member Obligations originally to be purchased by each such Qualified Interests Purchaser in relation to all the Units originally to be purchased by all Qualified Interests Purchasers, or as they may otherwise agree. In the event that any Qualified Interests Purchaser fails to tender payment for the Forfeited Interests allocated to it by no later than the Forfeited Interests Purchase Date, then the Qualified Interests Purchasers that do timely tender such payment shall have the right to purchase all but not less than all of the Forfeited Interests for which such payment is not tendered by advising the Selling Member at such scheduled closing of their commitment to purchase such Forfeited Interests and tendering payment therefore in full no later than the Forfeited Interests Purchase Date. Such remaining Forfeited Interests shall be allocated among the Qualified Interests Purchasers that do tender such payment in proportion to the number of Units originally to be purchased by each such Member or as they may otherwise agree.

12.4    Tag Along.

(a)    In the event that the any Member desires to sell, in one transaction or a series of related transactions permitted by Section 12.3 Units representing at least twenty percent (20%) of its Units then no such sale shall be consummated unless the purchaser(s) offers to purchase the same proportionate share of the Units of all other Members as the Member is selling, and on the same terms and conditions offered to the selling Member. The selling Member shall send notice to all Members of such proposed sale and its terms. In order to exercise its rights under this subsection (a), a Member shall give notice of such exercise to the selling Member within twenty (20) days of the receipt of the notice of proposed sale and terms. The sale of the Units shall not occur prior to the end of such twenty (20) day period, and shall be held simultaneously with the sale by any other Member accepting the purchaser's or purchasers' offer.

12.5    Notice of Termination.

(a)    If any Member (the "Noticing Member") desires to terminate his interest in the Company, the Noticing Member shall provide written notice (the "Notice of Sale") to the other Member (the "Recipient Member"). The Notice of Sale shall state the Noticing Member's determination of the per Unit value of the Membership Interest of the Company.

(b)     The delivery of a Notice of Sale shall constitute (i) an offer by the Noticing Member to purchase the Units of the Recipient Member; or (ii) an offer by the Noticing Member to sell his Units to the Recipient Member, at the per unit price set forth in the Notice of Sale.

(c)     In the event the Recipient Member shall elect to purchase the Units of the Noticing Member, he shall provide written notice of such election to the Noticing Member within thirty (30) days of receipt of the Notice of Sale (the "Reply Notice"). The Reply Notice shall set the date and time of closing, which shall be within ninety (90) days of receipt of the Notice of Sale. In the event the Recipient Member shall fail to so elect to purchase the Units of the Noticing Member, then he shall be conclusively presumed to have accepted the Noticing Member's officer to acquire the Units of the Recipient Member. In such event closing of the sale shall take place on the date which is one hundred twenty (120) days after the receipt of the Notice of Sale.

(d)     At closing the purchaser shall pay ten percent (10%) of the purchase price by wire transfer or cashier's check and deliver a nonnegotiable promissory note in an original principal amount equal to ninety (90%) of the purchase price, payable in sixty (60) equal monthly installments, commencing with the first day of the second month following of closing, bearing interest payable annually in arrears at the lowest rate which avoids the imputation of interest pursuant to the Internal Revenue Code of 1986, as amended. The note shall provide that if any of the payments due thereunder shall remain in arrears for a period of fifteen (15) days after written notice of nonpayment, the entire unpaid principal balance, together with accrued interest, shall immediately thereafter, at the option of the holder thereof, become due and payable on demand. The maker may prepay the note in whole or in part, without penalty, but any partial payment shall be applied first against the installments due in inverse order of due date.

12.6   Noncompliance. Any Disposition or attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article XII, is null and void ab initio.

12.7   Transferees as Assignees. Except as otherwise provided herein, any transferee of a Unit transferred pursuant to the terms of this Article XII, other than a transferee who was a Member prior to such transfer, shall be an Assignee with respect to the Membership Interest so transferred for the purposes of this Agreement until such transferee becomes a Substitute Member pursuant to Section 17.2.

12.8   Required Assumption of Obligations. No assignment, transfer or purchase of Units, , shall be effective unless and until the Assignee, transferee or purchaser expressly assumes all of the obligations of its Assignor, transferor, or seller under this Agreement then applicable to the Units by a writing delivered to the Company, to any company in which membership interests are so transferred. Provided that the requirements of this Article XII are fulfilled, notwithstanding anything to the contrary in Section 15.2, any such Assignee, transferee or purchaser receiving Units, in compliance with Section 12.3 shall automatically become a Substitute Member entitled to the rights of its Assignor, transferor, or seller hereunder.

## ARTICLE XIII.
## TAXES

13.1 Elections. The Board may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company.

13.2 Tax Matters Partner. For so long as the Company is subject to federal income taxation as a partnership, the tax matters partner of the Company pursuant to Section 6231(4)(7) of the Code shall be a Member designated by a Majority of the Members. Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of Section 6223 of the Code. Any Member who is designated tax matter partner may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of the Members. The Tax Matters Partner will take no action that is reasonably expected to have a material adverse effect on one or more of the Members unless such action is approved by the unanimous vote of the affected Members. The Tax Matters Partner will be responsible for notifying all Members of ongoing tax proceedings, both administrative and judicial, and will represent the Company throughout any such proceeding. Any Member who elects to do so may participate in any such proceeding. Any settlement agreement with the Internal Revenue Service will be binding upon the Members only as provided in the Code. The Tax Matters Partner will not bind any other Member to any extension of the statute of limitations or to a settlement agreement without such Member's written consent. If the Tax Matters Partner does not file a petition for readjustment of the partnership items in the Tax Court, federal District Court or Claims Court within the ninety (90) day period following a notice of a final partnership administrative adjustment, any Member may institute such action within the following sixty (60) days. The Tax Matters Partner will timely notify the other Members in writing of its decision.

13.3 Method of Accounting. The records of the Company shall be maintained, for tax purposes, on a cash receipts and disbursements method of accounting and for each fiscal year thereafter until the Board determines that the Company will adopt the accrual method of accounting.

## ARTICLE XIV.
## DISSOCIATION OF A MEMBER

14.1 Dissociation. A Person shall cease to be a Member (any such Person, a "Dissociating Member") upon the happening of any of the following events:

(a) The Withdrawal of the Member;

(b) The Member becoming a Bankrupt Member;

(c) In the case of a Member who is a natural person, the death of the Member, the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person or estate; the divorce of a Member resulting in the transfer of all of such Member's interest;

(d)    In the case of a Member that is a corporation, limited liability company or other Entity, the filing of a certificate of dissolution, or the equivalent thereof, for the Entity or the revocation of its charter (it being understood that the merger of a Member into another Entity without more shall not constitute such an event); and

(e)    In the case of an estate or trust, the distribution by the fiduciary of the estate's or trust's entire interest in the Company.

14.2    Rights of Dissociating Member. In the event any Member becomes a Dissociating Member, the transferee of such Member (by operation of law or otherwise) shall be an Assignee, subject to the terms of Article XIV.

## ARTICLE XV.
## ADMISSION OF ASSIGNEES

15.1    Rights of Assignees. The Assignee of a Membership Interest has no right to participate in the management of the business and affairs of the Company or to become a Member. The Assignee is only entitled to receive the Distributions and return of capital, and to be allocated the Net Profits and Net Losses attributable to the Membership Interest assigned to the Assignee.

15.2    Rights of Substitute Member. An Assignee of a Membership Interest in a transaction permitted by Article XII who is not at the time of such transaction already a Member shall be admitted as a Substitute Member only with the approval of a Majority of the Members holding the Units held by such Assignee (after giving effect to any conversion thereof). A Substitute Member will have all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interest and shall be required to execute an admission agreement agreeing to abide by the terms and conditions of this Agreement. The admission of a Substitute Member, without more, shall not release the Member originally assigning the Membership Interest from any liability to the Company that may have existed prior thereto.

## ARTICLE XVI.
## DISSOLUTION AND WINDING UP

16.1    Dissolution. The Company shall be dissolved and its affairs wound up, upon the earlier to occur of:

(a)    The approval of the Board pursuant to Section 7.1, or

(b)    The occurrence of an event requiring the Company to be dissolved and its affairs wound up under the Delaware Code.

16.2    Effect of Dissolution. Upon dissolution of the Company pursuant to Section 18.1(a), the Company shall cease carrying on the Company business, as distinguished from winding up such business, but the Company shall not be terminated by such dissolution, but shall continue until the winding up of the affairs of the Company is completed.

16.3    Distribution of Assets on Dissolution. Upon the winding up of the Company, the Company Property shall be distributed:

(a)    To creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company Liabilities; and

(b)    To the Members in accordance with Section 10.6.

16.4    Winding Up and Certificate of Cancellation. The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made and all of the remaining Property of the Company has been distributed to the Members. Upon the completion of winding up of the Company, a certificate of cancellation shall be delivered to the Secretary of State of Delaware for filing. The certificate of cancellation shall set forth the information required by the Delaware Code.

ARTICLE XVII.
BUSINESS OPPORTUNITIES

17.1    No Other Obligation. Except as otherwise set forth herein, no Member (including its directors, officers, employees, shareholders, and Affiliates) shall have any obligation to any other Member or the Company to present any business opportunity to the Company or to refrain from taking any such opportunity for its own account (individually or as a partner, member, shareholder, or otherwise) or from recommending any such opportunity to others, or to refrain from engaging in any business or possessing an interest in any other business ventures of any nature or description, independently or with others, for its own account; provided, however,

(a)    Dr. Victor Loria shall be obligated to contribute to the Company without any consideration any intellectual property including, but not limited to know how, going concern value, patent(s) and patent applications related to the pharmaceutical compound identified as a silicone oil based compound, or its derivatives, and shall not pursue commercialization of such compound individually or th rough any other Person;

(b)    Should Dr. Victor Loria decide to pursue the creation of a compounding pharmacy for the purpose of manufacturing a silicone oil based compound, or its derivatives, it shall be operated as a wholly owned subsidiary of the Company.

ARTICLE XVIII.
AMENDMENT

18.1    Agreement May Be Modified. This Agreement may be modified as provided in this Article XX (as the same may, from time to time, be amended). No Member shall have any vested rights in this Agreement which may not be modified through an amendment to this Agreement.

18.2    Amendment or Modification of this Agreement. Except as otherwise set forth herein, this Agreement may be amended or modified from time to time only by a written instrument adopted and executed by a Majority of the Members; provided, however, that any

amendment to this Agreement which would have the effect of reducing the number of Units of a Member or imposing any liability on a Member (as opposed to on the Company), other than pursuant to specific provisions herein, shall not be effective unless consented to by such Member. Notwithstanding the preceding sentence (other than the proviso clause thereto), no provision in this Agreement may be amended to reduce the vote of the Members required to approve or consent to any matter except by a vote of a Majority of Members which would be required to approve or consent to such matter; it being understood and agreed, however, that the dilution of the interests of the Members resulting from the issuance of additional Units in compliance with this Agreement shall not constitute such an adverse effect nor shall the making of any special allocations to another class of Members of items of income, gain, loss, deduction, or credit pursuant to any amendment to Article X effected in connection with the admission of new Members, the assumption by a Member of any obligations of the Company, the making of additional contributions to the Company or any similar events; provided that (x) such allocations are reasonably related to the assumption of obligations, additional contributions, or other similar events and (y) such allocations are allocated away from all Members not making such contribution or assuming such liabilities on a pro rata basis.

## ARTICLE XIX.
## MISCELLANEOUS PROVISIONS

19.1 Entire Agreement. This Agreement represents the entire agreement among all the Members and between the Members and the Company with respect to the subject matter hereof.

19.2 No Partnership Intended for Nontax Purposes. The Members have formed the Company under the Delaware Code and expressly do not intend hereby to form a partnership under Title 4 of the Business Organizations Code. The Members do not intend to be partners to one another or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

19.3 Rights of Creditors and Third Parties under Agreement. This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees.

19.4 Notice. Any and all notices contemplated by this Agreement shall be in writing and, except as otherwise provided herein, shall be deemed adequately given when delivered in hand, or upon receipt when sent by telecopy confirmed by one of the other methods for providing notice set forth herein, or one (1) Business Day after being sent, postage prepaid, by nationally recognized overnight courier (e.g., Federal Express), or five (5) Business Days after being sent by certified or registered mail, return receipt requested, postage prepaid, to the party or parties for whom such notices are intended. Notice to the Company shall be sent to it at the address of the Principal Office, marked to the attention of the Secretary. Notice to a Member shall be sent to the address reflected on Exhibit B of this Agreement. Notice of a change of address shall not be deemed given until received.

19.5    Counterparts. This Agreement may be signed in any number of counterparts, and may be executed through the use of counterpart execution pages.

19.6    Partition. Each Member waives any and all rights that it may have to maintain an action for partition of the Company's Property.

19.7    Governing Law, Submission to Jurisdiction, and Waiver of Jury Trial.

(a)    THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS BY THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICT OF LAWS PROVISIONS.

(b)    EACH PARTY HERETO HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION. THIS SECTION 21.7 HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS SHALL NOT BE SUBJECT TO ANY EXCEPTIONS. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, SUPPLEMENTS, OR MODIFICATIONS TO (OR ASSIGNMENTS OF) THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL (WITHOUT A JURY) BY THE COURT.

19.8    Remedies. Each party hereto acknowledges and agrees that the remedies at law for a breach or threatened breach of any of the provisions of this Agreement that affect the rights of the other parties hereto would be inadequate and, in recognition of this fact, agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, each party hereto shall be entitled to equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction, or any other equitable remedy which may then be available, without the necessity of proving irreparable harm. Each party hereby stipulates and agrees that in the event of such a breach or threatened breach, the other parties hereto will suffer irreparable harm. The remedies provided in this Section 21.8 shall be cumulative and shall not

preclude the assertion or exercise of any other rights or remedies available under law, in equity or otherwise in accordance with this Agreement.

19.9 Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

19.10 Nondisclosure of Names of Members. Each Member acknowledges that during the term of this Agreement, the Member will or may become aware of the identity of other Members and other Person's beneficial ownership of equity in other Members. Each Member agrees that such Member will not in any way disclose to any Person who is not a Member the identity of such other Member or other Person, unless (i) expressly authorized in writing by the other Member or other Person, (ii) required by law, or (iii) in the case of disclosure to employees and independent contractors who need to know such information in connection with their services, to the extent so needed and with restrictions on disclosure by such employees and independent contractors comparable to the provisions of this Section 19.10.

IN WITNESS WHEREOF, we have hereunto set our hands on the date set forth beside our names.

Dr. Victor Loria

John Stanise

**EXHIBIT A**
**DEFINITIONS**

"Additional Member" means any of those persons identified as such on Exhibit B and which, for the avoidance of doubt, shall not include any Class E Members.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentence of either of Treasury Regulation §§ 1.704-2(g)(1) or 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Treasury Regulation § § 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person, whether through ownership of voting securities or otherwise. For purposes hereof, "control" shall mean with respect to any Person, any other Person that has the ability to elect a majority of such Person's board of directors or similar governing body or the ability (by contract, share ownership or otherwise) to direct the policies and management of such Person.

"Assignee" means a transferee of a Membership Interest who has not been admitted as a Substitute Member, other than a transferee that was a Member immediately prior to such transfer.

"Assignor" has the meaning specified in Section 6.3.

"Bankrupt Member" means any Member who: 1) makes an assignment for the benefit of creditors; 2) files a voluntary petition in bankruptcy; 3) is adjudged a bankrupt or insolvent, or has entered against the member an order for relief, in any bankruptcy or insolvency proceeding; 4) files a petition or answer seeking for the member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; 5) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the member in any proceeding of this nature; or 6) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the member or of all or any substantial part of the member's properties.

"Board" means the Board of Representatives of the Company with such powers and duties as are described in Article VII.

"Business Day" means any day other than Saturday, Sunday or any legal holiday observed in New York.

"Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with the following provisions:

(a)     To each Member's capital account there shall be credited such Member's Capital Contributions, such Member's distributive share of Net Profits and any other item in the nature of income or gain which is specifically allocated pursuant to Sections 10.1 and 10.2 to such Member, and the amount of any Company Liabilities assumed by such Member or which are secured by any Company Property distributed to such Member.

(b)     To each Member's capital account there shall be debited the amount of cash and the Gross Asset Value of any Company Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Net Losses and any other item in the nature of deduction or loss which is specifically allocated pursuant to Sections 10.1 and 10.2 to such Member and the amount of any liabilities of such Member assumed by the Company or which are secured by any Property contributed by such Member to the Company.

(c)     In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(d)     In determining the amount of any liability for purposes of (a) and (b) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1 (b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company. The Members shall also make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

"Capital Contribution" shall mean, with respect to any Member, the aggregate amount of cash and the initial Gross Asset Value of any property (other than cash) contributed to the Company by such Member, and shall include the initial Capital Contribution of such Member.

"Classes" has the meaning specified in Section 9.1(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Commitment" has the meaning specified in Section 8.2(b).

"Company" has the meaning specified in the Preamble.

"Company Liability" means any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

"Company Minimum Gain" shall mean "partnership minimum gain" of the Company within the meaning of Treasury Regulation § 1.704-2(b)(2) and shall be computed in accordance with Treasury Regulation § 1.704-2(d).

"Company Property" means any Property owned by the Company.

"Covered Person" means any Member, former Member, any Affiliate of a Member or former Member, or any Representative, Officer, or any officers, directors, shareholders, partners, employees, representatives or agents of a Member or former Member or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

"Delaware Act" has the meaning specified in the Preamble.

"Delinquent Member" means a Member who has failed to meet the Commitment of that Member.

"Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

"Disassociating Member" has the meaning specified in Section 16.1.

"Disposition" means any sale, assignment, transfer, exchange, mortgage, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law). "Dispose" means to conclude any Disposition. Notwithstanding the foregoing, a direct or indirect pledge of a Membership Interest or Units to secure indebtedness for money borrowed or to secure a derivative transaction shall not constitute a transfer of such interest prior to foreclosure on such pledge, so long as there is no voting agreement or proxy related to such pledge.

"Dissociation" means any action which causes a Person to cease to be Member as described in Article XIV.

"Distribution" means a transfer of Property to a Member on account of a Membership Interest as described in Article X.

"Entity" means a Person other than a natural person. Entity includes corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, trusts, estates and unincorporated associations. For purposes of this Agreement, the term Entity shall include joint tenancies and tenancies by the entirety.

"Exchange Act" has the meaning specified in Section 4.4.

"GAAP" means generally accepted U.S. accounting principles consistently applied.

"Gross Asset Value" means, with respect to any Property, the Property's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any Property contributed by a Member to the Company shall be the gross fair market value of such Property, as determined by the Member making the contribution and the Company;

(b)     The Gross Asset Values of all Company Property shall be adjusted to equal such Property's gross fair market value, as determined by the Members, as of the following times:

(i)     The acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution;

(ii)     The distribution by the Company to a Member of more than a de minimis amount of Company Property as consideration for an interest in the Company if the Members reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(iii)     The liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(c)     The Gross Asset Value of any Company Property distributed to any Member shall be the gross fair market value of such Property on the date of distribution; and

(d)     The Gross Asset Values of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1 (b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection to the extent the Members determine that an adjustment pursuant to subsection (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (a), (b) or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Judgment" means any judgment, order, ruling or injunction of any authority of competent jurisdiction in any Proceeding.

"Lien" means any lien, mortgage, charge, security interest, burden, encumbrance or other restriction, adverse claim or limitation.

"Majority" has the meaning specified in Section 6.3.

"Member Loan" has the meaning specified in Section 8.5.

"Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Liability, determined in accordance with Treasury Regulation § 1.704-2(i)(3).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" within the meaning of Treasury Regulation §§ 1.704-2(i)(1) and 1.704-2(i)(2).

"Member Nonrecourse Liability" shall mean "Partner nonrecourse debt" or "partner nonrecourse liability" within the meaning of Treasury Regulation § 1.704-2(b)(4).

"Membership Interest" means the rights of a Member or, in the case of an Assignee, the rights of the assigning Member in Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company.

"Net Profits" and "Net Losses" means, for each fiscal year or other applicable period of the Company taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(e)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

(f)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(g)     In the event the Gross Asset Value of any asset of the Company is adjusted (as provided in the definition of Gross Asset Value herein), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(h)     Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

(i)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period.

(j)     Any items specially allocated pursuant to Article X shall not be included in the computation of Net Profits or Net Losses.

"Offeror Selling Period" has the meaning specified in Section 12.3(d).

"Officers" has the meaning specified in Section 7.3(a).

"Operating Agreement" means this Agreement and amendments adopted in accordance with this Agreement and the Delaware Code.

"Patent Rights" means any and all patents, utility models, and other patent rights of any kind under the laws of all countries in the world, including reissues and reexaminations thereof, and applications and provisional applications for any of the foregoing, including any divisions, continuations and continuations in part, now or in the future owned by the Company, or under which the Company otherwise has or will have the right to grant licenses, including but not limited to those issued patents listed in Schedule A to Exhibit A attached hereto and those applications listed in Schedule B to Exhibit A attached hereto.

"Person" means an individual, trust, estate, or any incorporated or unincorporated Entity permitted to be a member of a limited liability company under the laws of Delaware.

"Principal Office" has the meaning specified in Section 2.5.

"Proceeding" means any administrative, judicial, or other adversary proceeding, including litigation, arbitration, administrative adjudication, mediation, and appeal or review of any of the foregoing.

"Property" means any property real or personal, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

"Pro Rata Portion" with respect to any Member shall mean a percentage equal to the ratio of the number of Units owned by such Member to the total number of Units, as applicable, owned by such designated group, Class or Classes of Members.

"Regulations" means, except where the context indicates otherwise, the permanent, temporary, proposed, or proposed and temporary regulations of the Department of the Treasury under the Code, as such regulations may be lawfully changed from time to time.

"Relative" of any person means any ancestor, descendant, sibling, spouse or divorced spouse of such person.

"Remainder Notice" has the meaning specified in Section 12.5(c).

"Representative" means any natural person appointed as a member of the Board pursuant to the provisions of this Agreement.

"Secretary" means the natural person appointed by the Board or the CEO, as the case may be, as the Secretary of the Company who shall perform the duties described in Section 5.1.

"Selling Member" has the meaning specified in Section 12.3.

"Substitute Member" means an Assignee who has been admitted to all of the rights of membership pursuant to this Agreement.

"Taxable Year" means the taxable year of the Company as determined pursuant to §706 of the Code.

"Taxing Jurisdiction" means any state, local, or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

"Delaware Code" has the meaning specified in the Preamble.

"Third Party Offer" has the meaning specified in Section 12.3(a).

"Unit" means any equity interest in the Company.

"Withdrawal" means any event described in this Agreement or the Delaware Code, which terminates a Person's status as a Member.

**EXHIBIT B**
**MEMBERS/UNITS**

Dr. Victor Loria: 70 units

John Stanise: 30 units

**EXHIBIT C**
**PATENT APPLICATION**

U.S. Application Serial No. - 15/405.240
Filing Date - 1/12/17

Title: SILICONE OIL-IN-WATER COMPOSITION
USEFUL AS AN INJECTABLE FILLER
AND AS A SCAFFOLD FOR COLLAGEN
GROWTH