**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

The Law Offices of Neal Brickman, P.C.
*Attorneys for Plaintiff-Respondent John Stanise*
420 Lexington Ave, Ste. 2440
New York, New York 10170
(212) 986-6840 (Telephone)
(212) 986-7691 (Fax)
ATTORNEYS OF RECORD:
   JASON A. STEWART, ESQ.
   NEAL BRICKMAN, ESQ.

---------------------------------------------------------------X
JOHN STANISE,                          :
                                       :
            Plaintiff,                 :         **Civil Action No.: 20-cv-2769**
                                       :
   Vs.                                 :
                                       :
                                       :
VICTOR LORIA,                          :
                                       :
            Defendant.                 :
---------------------------------------------------------------X

**DECLARATION OF JOHN STANISE IN OPPOSITION TO DEFENDANT'S MOTION SEEKING THE ENTRY OF TEMPORARY RESTRAINTS AND A PRELIMINARY INJUNCTION AND IN SUPPORT OF PLAINTIFF'S CROSS MOTION SEEKING THE ENTRY OF TEMPORARY RESTRAINTS AND A PRELIMINARY INJUNCTION COMPELLING DR. LORIA TO COMPLY WITH THE LORSTAN OPERATING AGREEMENT**

I, John Stanise, of full age and sound mind, hereby declare, under the penalty of perjury, as follows:

1.      I am John Stanise, and I am the Plaintiff in the above-referenced matter brought against my business partner, Victor Loria ("Loria"). I am the Chief Executive Officer ("CEO") and a member of Lorstan Pharmaceutical LLC (the "Company" or "Lorstan").

1

2. I make this Declaration in opposition of Defendant's Motion for a Temporary Restraining Order and Preliminary Injunction, pursuant to Fed. R. Civ. P. 65(a) and (b). I also make this Declaration in support of my cross motion for a Temporary Restraining Order and Preliminary Injunction compelling Loria to make his contractually mandated capital contributions and forbidding Loria from opening up any additional offices or otherwise interfering with the business of Lorstan.

3. The information below is based on my personal knowledge and is true and correct to the best of my knowledge, information and belief.

4. Loria's Declaration—submitted in support of his motion—attempts to continue his false narrative. It is filled with knowing misstatements of fact intended to distract the Court from an unassailable truth: Loria is consumed with increasing the revenue realized by his private medical practice—Loria Medical—to the detriment of Lorstan and in violation of the Lorstan Operating Agreement.

5. I am a Certified Public Accountant and a 30% equity member of Lorstan, where I serve as the Company's CEO. The remaining membership units of the Company are held and controlled by my partner Loria, a licensed cosmetic dermatologist. Loria maintains a private medical practice, Loria Medical, in Miami, Florida.

6. The Company, a Delaware Limited Liability Company was formed on or about May 19, 2016. Simultaneous with its formation, I and Loria executed an Operating Agreement (the "Agreement"), which set forth the terms upon which the Company would be operated. The Agreement has been amended three times. A true and accurate copy of the Agreement and each of the Amendments is annexed hereto as Exhibit "A".

7. The First Amendment to the Operating Agreement, Section 17.1 (b), executed on March 30, 2018 specifically prohibits Loria from opening up multiple offices. He is limited to operating his Miami, Florida Loria Medical office.

8. I reside within the State of Connecticut, and the Company is, and has always been, head quartered in -- and with all business operations conducted out of -- the State of Connecticut. The Company's only physical office is in Wilton, Connecticut. All vendor invoices are received into, and paid out of, that office. The Company has no office in Florida and none of its operations are conducted in that state.

9. My partner's attestation that the Company is based in Florida is entirely untrue. The Company's operations are based in Connecticut, with only licensee physician training taking place at Defendant's Florida-based Loria Medical offices.

10. My partner has also mischaracterized the Company's business model, in as much as, Lorstan is <u>not in the business of manufacturing or selling pharmaceutical products</u>, but rather, Lorstan licenses medical technology to licensee physicians to allow Lorstan licensees to compound Lorstan's Patented Silicone Product (the "Product") under the auspices of the licensees' own medical licenses in accordance with a Lorstan Licensee Agreement. A true and accurate illustrative copy of the Lorstan Licensee Agreement is annexed hereto as Exhibit "B". Lorstan, by and through, its licensed and specially trained pharmacist, operates four labs—in California, Texas, Georgia, and Florida (still under construction)—within which the licensee doctors compound the Product by retaining a Lorstan's trained pharmacist.

11. The Product was invented by Loria and is injected in patients by licensee doctors to cause permanent male enhancement. The patent, which was obtained by the Company's own

efforts, and the right to commercialize the Product were irrevocably assigned by Loria to Lorstan. A true and accurate copy of the Assignment is annexed hereto as Exhibit "C".

12. Lorstan is paid a per dosage fee each time a licensee physician compounds pursuant to the Lorstan Licensing Agreement. Lorstan does not sell, nor is it allowed under the law to sell, pharmaceutical products.

13. Notably, the Lorstan Licensee Agreement contains hold harmless language that indemnifies Lorstan and the Defendant for any potential harm arising from the licensee physicians' conduct, or the use of pharmaceuticals compounded by pursuant to the Lorstan Licensee Agreement. The claim of potential legal exposure made by the Defendant is a feigned concern offered as a red-herring.

14. To be clear, the business of Lorstan requires neither Lorstan, the Plaintiff, nor the Defendant to compound pharmaceuticals. Rather, the Lorstan business model provides for a licensed pharmacist, who has been trained by the Defendant, to sub-contract with Lorstan licensee physicians and for that pharmacist to compound Lorstan's patented Product under the auspices of the licensee physician and his medical license.

15. The compounding is performed by a licensed pharmacist within sterilized labs made available to the licensee physicians by virtue of a Lab Usage Agreement. A true and accurate illustrative copy of the Lab Usage Agreement is annexed hereto as Exhibit "D".

16. In fact, the labs used for compounding by licensee physicians under the Lab Usage Agreements, which are located in Florida, Georgia, Texas and California, are not owned by Lorstan. Rather, those labs are independently owned and held by separate entities which Plaintiff and Defendant own in the same 30/70 ownership proportions that they own Lorstan.

17. Defendant's claims within his declaration that Lorstan owns and operates compounding labs and that Lorstan manufacturers the Patented Silicone Product is a knowing misstatement of fact.

18. Defendant's claims that Lorstan's ongoing operations is, in any way, dangerous or may lead to patient harm is equally unfounded and is patently untrue. So too is any claim that Lorstan has altered or changed the compounding process or the ingredients of the Product. As misconstrued by Loria in my email dated April 23, 2020. I explicitly told Loria that there was no change in the ingredients or procedure in an email dated April 27, 2020 and stated again in a separate email dated April 28, 2020. True and accurate collective copies of those emails are annexed hereto as Exhibit "E".

19. Defendant's contention that he is legally responsible for ensuring standards with respect to compounding facilities, methods, and techniques is also not true, as <u>Lorstan does not and cannot compound pharmaceuticals</u>.

20. In fact, as the compounding is done under the licensee physician's medical license, by a licensed pharmacist. It is the licensee physician who is legally responsible for ensuring that the compounding is done appropriately, not Lorstan or the Defendant.

21. There is also no requirement to be a licensed pharmacist to compound pharmaceutical products under the auspices of a doctor's license. Rather, the individual performing the compounding need only be a person with the skills to compound and have the reasonable confidence of the physician under whose auspices the compounding is being performed. Loria is aware of such governing laws and the applicable requirements concerning compounding and is making knowing misstatements to the Court.

22. With respect to ensuring that the compounding facilities are in compliance with federal, state and local standards, Lorstan has retained independent experts to certify all labs used by licensee physicians for compounding the Lorstan product meet sterility requirements and all applicable standards. Again, Defendant has had no role or responsibility in this regard and his feigned concern over these issues must be given no credence. In fact, the Defendant has refused to participate in or otherwise provide technical support in this regard, thus necessitating the hiring of an independent expert. His claim that he is required or that he is concerned with hypothetical patients' health is a red-herring, posited only for the purpose of hindering, and potentially closing, Lorstan's business so that he can divert those business opportunities to Loria Medical, in violation of the Operating Agreement and his fiduciary duties.

23. To be clear, there is no requirement, either in practice or in law, that requires a doctor to supervise a laboratory used for the purposes of compounding pharmaceuticals. Under the law, any individual can own and/or manage a pharmacy of any kind, including a compounding lab, as long as they employ qualified individuals to fulfill state law requirements.

24. Defendant's role in the Company is, and has always been, to serve in a limited capacity as the Company's medical resource, whereby he was required to train licensees physicians on how to use the pharmaceutical product and to provide technical advice as required regarding compounding and medical procedure matters.

25. At no point in time, have I or any member of my staff, ever interfered with Defendant's limited role. Quite to the contrary, since January 2020 Loria has refused to perform these limited tasks unless I agree to allow him to open additional Loria Medical officers in contravention of the Agreement. Attached hereto as Exhibit "F" are true and accurate copies of collective emails from Loria wherein he has refused to train licensee/doctors, answer lab related

questions, or make contractually mandated capital contributions unless I agree to allow him to open additional Loria Medical office to complete with Lorstan.

26. Moreover, there has been no effort to remove the Defendant from the "compounding operations," because the Defendant was never involved in any Lorstan compounding operations and because Lorstan does not compound--the pharmacist compounds under the auspices of the licensee physician pursuant to the Lorstan Licensee Agreement.

27. The Defendant has not been locked out of any labs and the pharmacist trained by the Defendant to conduct compounding in accordance with Lorstan Licensee Agreements has not been instructed to "not speak with" the Defendant as is claimed in Defendant's Declaration.

28. The Defendant has never had keys to any of the laboratories and has only recently sought access to the laboratory amid this dispute as a further basis to claim that he has been aggrieved. I have refused to provide the keys because I have been, and I remain, concerned that, given the current dispute, if the Defendant is provided keys to access the laboratories directly, which he would have no business purpose to do, it will result in the laboratories being damaged or sabotaged by the removal of necessary supplies. My concerns were borne from the fact that Loria, in order to disrupt Lorstan's operations and leverage me to allow him to open multiple offices as Loria Medical, unilaterally and without any notice closed the Company's Operating Account and withdrew all of the money from that account. He believes that if he cripples the Company's ability to operate, I will accede to his demands.

29. With respect to the Defendant's allegation that communication was made on April 23, 2020 to the Defendant advising that there is any intent to modify or change the ingredients in the Patented Silicone Product and the method that it is compounded, no such communication ever occurred. Rather as can be seen in the email correspondence exchange between Plaintiff and

Defendant, Defendant is mischaracterizing a comment within the email made about lab sterilization prerequisites and offering further mistruths to this Court. In the email exchange, to Loria I made it quite clear that neither the ingredients for the Product nor the procedure for compounding have been altered or changed at all. True and accurate copies of those emails are attached hereto as Exhibit "E".

30. Rather as is evident, Defendant has sought to manufacture a conflict and develop a false narrative while refusing to abide by the terms of the Company's Operating Agreement and refusing to serve as a medical resource, by *inter alia*, refusing to train doctors and refusing to provide technical assistance with respect to medical and pharmaceutical matters.

31. The Defendant's conduct has strained the relationship between Lorstan and their trained pharmacist, who is not an employee of Lorstan and who is not paid a salary despite Defendants contention to the contrary. Specifically, Defendant overtly threatened the pharmacist's professional license, leading to her temporary resignation and creating barriers for her continuing under the existing arrangement whereby she had previously agreed to sub-contract with Lorstan Licensee physicians to perform compounding.

32. Defendant now seeks to inflate his role in Lorstan and conflate his duties and my duties, as the CEO, to provide support for his violative behavior.

33. Defendant's Machiavellian conduct is part of a concerted effort to force the renegotiation of the Lorstan Operating Agreement so as to allow the Defendant to open additional medical offices that would allow him to compete with, co-opt, or otherwise subvert potential patients away from Lorstan licensee physicians, thereby harming Lorstan's economic interests.

34. Indeed, Defendant has approached a number of Lorstan licensee physicians, and/or potential Lorstan licensee physicians about those physicians joining his Loria Medical Practice, in

the process undermining the Lorstan business model of developing a network of licensee physicians for the purpose of Defendant's own substantial economic benefit, which comes directly at the expense of Lorstan. An example of Loria's solicitations made to a potential Lorstan licensee physician, Dr. Alex Roher on March 21, 2020 is memorialized in email. A true and accurate copy of that email correspondence is annexed hereto as Exhibit "G".

35. At present, Defendant has repeatedly threatened to open a new office and laboratory in New York, and upon information and belief, has begun to do the necessary preliminary work to have that office open. Loria had a small satellite office in New York that was permanently closed, not "temporarily shuttered" on or about May 2018 as part of an agreement relating to the Company's First Amendment to the Operating Agreement which was signed two months earlier in March of 2018.

36. Loria's threat to open a new office in New York follows concrete plans and efforts by Lorstan to attract and contract with at least two New York based physician and the preparing of a budget for the construction of a New York based laboratory.

37. The opening of a New York based Loria Medical office and the solicitation of Lorstan physicians to work within Loria Medical offices is violative of the Lorstan Operating Agreement.

38. On or about March 30, 2018 an Amendment to the Lorstan Pharmaceutical, LLC Operating Agreement (the "First Amendment") was made.

39. Pursuant to the First Amendment, Paragraph 1, it is reiterated and agreed that the Company is formed solely for the purposes of (i) for-profit development, licensing, exploitation, and commercialization of a pharmaceutical compound identified as silicone oil base compound, or its derivatives, and any existing or pending patents. (See Exhibit "A" p. 1, ¶ 1).

40. The First Amendment further revises Section 17.1 to state as follows:

> "17.1 <u>No Other Obligations</u>. Except as otherwise set forth herein, no Member (including its directors, officers, employees, shareholders, and Affiliates) shall have any obligation to any other Member or the Company to present any business opportunity to the company or to refrain from taking any such opportunity for its own account individually or as a partner, member, shareholder, or otherwise) or from recommending any such opportunity to others, or to refrain from engaging in any business or possessing an interest in any other venues of any nature or description, independently or with others, for its own account; provided however,
>
> (b) Dr. Victor Loria **shall not pursue**, directly or indirectly, other than through Company or a management company which is a subsidiary of Company, **any commercial ventures relating to the opening of multiple medical offices**.
>
> (c) Dr. Victor Loria **shall not pursue**, directly or indirectly, other than through Company, **any commercial ventures derived from the introduction of Dr. Loria to any Person by John Stanise.**" (See Exhibit "A" p. 2 ¶ 3.)

41. Defendant, by seeking to open a New York based Loria Medical Office and by soliciting current licensees, some of whom were introduced to the Defendant by me, to join Defendant in the opening up of new offices under the Loria Medical brand name is in direct violation of Paragraphs 17.1 (b) and (c) of the First Amendment of the Lorstan Operating Agreement.

42. The Defendant is clearly pursuing "commercial ventures relating to the opening of multiple medical offices" and is pursuing "commercial ventures derived from the introduction" of persons to Dr. Loria by John Stanise. In fact, that portion of Loria's motion that seeks the Court's permission to open multiple offices seeks to eviscerate the protection of the Operating Agreement.

43. The First Amendment to the Operating Agreement was entered into for the very purpose of preventing this exact conduct by the Defendant and avoiding a circumstance whereby

Lorstan and Lorstan licensee physicians were caused to compete against the Defendant and his Loria Medical practice.

44. At present, Lorstan has licensee agreements with six physicians and has sought to, and continues to seek, to sign up additional licensee physicians.

45. But for Defendant's refusal to train additional physicians, Lorstan would and could have contracted with significantly more licensee physicians.

46. At present, the laboratories located in Florida, Georgia, Texas and California are nearly ready to be fully operational, with a limited number of minor technical requirements having been identified by Lorstan's expert as being needed to meet all compliance regulations. Lorstan is actively undertaking the necessary steps to ensure that these requirements are met, and it is anticipated that the labs will be fully operational within less than two weeks times.

47. But for Defendant's refusal to provide technical support on medical and pharmaceutical matters, Lorstan would have the ability to provide licensees with laboratories to compound in at least four states.

48. Presently, licensee physicians are currently requesting to compound Lorstan product, however, due to Loria's refusal to provide advice and funding, Lorstan is currently delayed from being able to service these licensees who are awaiting compound that otherwise would be available for their use, absent Loria's interference.

49. The Temporary Relief requested by the Defendant would interfere with Lorstan's ability to fulfill their obligations under the terms of the Lorstan Licensee Agreements and would, in effect, put Lorstan out of business.

50. Moreover, Defendant's refusal to provide training for new physicians and refusal to provide technical support for pharmaceutical and medical matters creates barriers to Lorstan's

ongoing business. In addition, Loria has refused to make required capital contributions, further jeopardizing Lorstan's ability to conduct business. Annexed hereto as Exhibit "H" is a true and accurate copy of the latest funding request with minimal redactions to protect confidential information, which Loria has ignored, thereby delaying the completion of the sterile labs and stalled the recruitment of additional licensee doctors.

51. Section 8.1(b) of the Operating Agreement provides that:

> In addition to the initial Capital Contributions, the Board may determine from time to time that additional contributions are needed to enable the Company to conduct its business. Upon making such a determination, the Board shall give notice to all Members in writing at least thirty (30) Business Days prior to the date on which such contribution is do. Such notice shall set forth the amount and purpose of the contribution, and the date on which the additional contribution is due. All such contributions shall be made by the Members proportional to their Units.

52. Defendant has manufactured this conflict and has attempted to create a false narrative so as to be able to use his role as majority shareholder to force a renegotiation of the Lorstan Operating Agreement that allows him to compete against Lorstan for his own personal economic benefit to the detriment of the Company.

53. Specifically, to avoid further future irreparable harm Defendant must be enjoined from the following:

   a. Opening any medical offices in addition to his Miami office in violation of Paragraph 17.1 (b) as set forth in the First Amendment;

   b. Pursuing directly or indirectly, other than through the Company, any commercial ventures derived from the introduction of Dr. Loria to any person by John Stanise in violation of Paragraph 17.1 (c) as set forth in the First Amendment;

   c. Doing business with current Lorstan licensees or any physicians who are current potential future licensees away from the Company;

  d. Refusing to make capital contributions in accordance with the Operating Agreement; and

  e. Taking further intentional actions which hinder, delay or otherwise interfere with the business operation of the Company, including Defendant's refusal to fulfill his duties as medical advisor and/or otherwise preventing the compounding of the Company's patented pharmaceutical product by and for licensees' use.

54. Loria's requests the entry of a Temporary Restraining Order and Preliminary Injunction against me ordering me to:

  a. "Stand down and cease [my] efforts to re-start production at Lorstan's compounding labs without Loria's oversight;"

  b. Not instruct Lorstan's compounding pharmacist "to cease communication with Loria;"

  c. Require me to reinstate Loria's access to Lorstan's compounding labs;

  d. Require me to reinstate Loria's access to the entirety of their books;

  e. Allow Loria complete unfettered, unsupervised access to the labs; and

  f. Be prevented from "using Lostan's Amended Operating Agreement to block" Loria's opening of a Loria Medical New York office "during the pendency of this litigation".

55. The majority of the relief sought by Loria is violative of the Operating Agreement and antithetical to the business operations of Lorstan.

56. Loria's first requested relief, asking the Court to Order me to cease efforts to facilitate compounding of Lorstan Product within the compounding labs without Loria's oversight, is in effect, a request to either shut down Lorstan's operations or otherwise provide Loria with the ability to shutdown Lorstan's operations at his whim. Licensing the medical technology and

facilitating the compounding of Lortan Product is Lorstan's only business and its only source of revenue. Loria has <u>never</u> had or exercised oversight over this process, and to issue an Order which prevents Lorstan licensees from compounding in the absence of some level of undefined "oversight" by Loria, is effectively shutting down Lorstan. In the alternative, Ordering that Loria is to have a level of undefined "oversight" would in essence simply allow Loria to continue to create impediments sabotaging the Company and preventing the Company from doing business, serving Loria's goals of driving Lorstan out of business so that he may co-opt and divert the presently available business opportunities for his own personal gain.

57. Loria's requested relief with respect to the communication by and between the pharmacist is inappropriate and derives from the fact that Loria has alienated the pharmacist through his conduct and threats. I have never directed the pharmacist to "cease communications" with Loria. In fact, Loria himself has created the impediments to communication between himself and the pharmacist by 1) threatening her pharmaceutical license and 2) refusing to provide medical support unless I agree to allow him to open Loria Medical offices. (See Exhibit "F").

58. Loria's requested relief with respect to "restoring [his] access to the labs" is equally inappropriate, as Loria has never had access to the labs. The labs were built by me and are used by Lorstan's pharmacist for compounding for licensee doctors. Loria has no legitimate business purpose to have access to the labs. His request for "oversight" and to be able to "supervise" the laboratory facilities are nothing more than a pretext to take control of Lorstan's business operations and to allow Loria to continue to create impediments sabotaging the Company and preventing the Company from doing business.

59. Loria's requested relief requiring me to reinstate Loria's access to the generically termed "entirety of the books and records" of the compounding labs, in addition to being overly

broad and vague, makes no sense at all. Loria has always had, and continues to have full access to the Lorstan accounting records and books. Loria has been afforded complete financial transparency and both he and his personal accountant, Edward Lampert receive financial reports and unfettered access to the Lorstan records and books on a regular quarterly basis. To the extent that Loria is seeking compounding logs or other compounding information pertaining to the compounding performed within the labs by the pharmacist, those records are the property of the licensee doctors, not the property of Lorstan. Therefore, it would be neither within my power, nor would it be appropriate for myself or Loria to be provided with access to any such compounding logs.

60. Loria's requested relief for complete unfettered access to the labs is disconcerting due to Loria's on-going attempts to sabotage Lorstan's business operations. Loria has no legitimate purpose to travel to or access the compounding labs, which were built for the purpose of allowing Lorstan licensee physicians to compound Product. Allowing Loria access to the labs, at this interval, would allow him an opportunity to further sabotage business operations. Loria has never had unfettered access to the compounding labs and his duties with Lorstan do not require him to have such access. His physical presence is not and has never been required in order for Lorstan licensee physicians to compound Lorstan product by way of Lorstan's trained pharmacist. Similarly, Loria request for access to the Company's books and records, ignores the fact that he already has that access. At his request, I forward all of the Company's accounting records to his accountant. Additionally, Loria and his accountant have remote access to all of the Company's bank accounts.

61. Lastly, Loria's request that I be prevented from "using Lorstan's Amended Operating Agreement to block" Loria's opening of a Loria Medical New York office "during the pendency of this litigation," slaps in the face of justice, as it actually asks this Court to enjoin my

ability to enforce my contractual rights. The requested relief, on its face admits that Loria seeks to act in contravention to the Operating Agreement by seeking to open Loria Medical offices to compete with Lorstan. Loria is in essence asking this Court to sanction his violative action and to prevent me, the Plaintiff who brought this lawsuit, from the very purpose of enjoining this and other violative behavior, from having access to justice. Loria's requested relief is entirely inappropriate, as it cuts against what I understand to be the operative law with respect to injunctive relief which requires a showing of a likelihood of success on the merits. Here, the Operating Agreement restricts Loria from opening new offices, therefore he cannot show that he can possibly succeed on the merits of the contractual dispute. Moreover, enjoining the ability to enforce contractual covenants is contrary to public policy.

    I declare under the penalty of perjury that the foregoing is true and correction.

Dated: May 19, 2020

                                                                  John Stanise