# EXHIBIT B

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement" or the "License") is made and entered into as of _____ (the "Effective Date") by and between ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ("Licensor"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and \_\_\_▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮\_\_\_ ("Licensee"), a \_\_\_medical doctor and medical practice\_\_\_ having an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Licensor and Licensee may be referred to herein as a "Party" or, collectively, as "Parties".

### RECITALS

**WHEREAS**, Licensor has various proprietary and confidential information relating to a silicone-based injectable filler composition and cosmetic enhancement methods using same (hereinafter "Injectable Technology"), and is the exclusive owner of the Licensed Patent (as defined herein), and of the inventions and improvements disclosed therein (hereinafter "the Invention");

**WHEREAS**, Licensor possesses technical information and expertise in the use of the Invention and in the Injectable Technology; and

**WHEREAS**, Licensee desires a license under the Licensed Patent and the Injectable Technology to make and use the Invention and the Injectable Technology,

**NOW, THEREFORE**, in consideration of the promises and mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.  **DEFINITIONS**

In this Agreement, the following terms shall have the following meanings:

1.1 "Affiliate" means a Person that controls, is controlled by or is under common control with a Party, but only for so long as such control exists.

1.2 "Licensed Patent" means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and any reexaminations or reissues thereof.

1.3 "Licensed Products" means compositions according to the Licensed Patent and/or making use of the Injectable Technology.

1.4 "Licensed Methods" means methods according to the Licensed Patent and/or the Injectable Technology.

1.5 "Licensed Use" means: (i) the compounding of the Licensed Products for the exclusive use of Licensee, (ii) the use by Licensee of the Licensed Products exclusively for soft tissue

augmentation in a patient, and (iii) the use of the Licensed Methods exclusively for soft tissue augmentation in a patient.

1.6   "Person" means and includes any natural person, corporation, firm, joint venture, partnership, limited liability company, trust, unincorporated organization, government or any department, political subdivision or agency of a government.

1.7   "Confidential Information" means any confidential or proprietary data or information with respect to Licensor, other than Trade Secrets (as defined hereafter), that is valuable to Licensor and not generally known to the public or to competitors of Licensor including: (i) information relating to the business, operations or products of Licensor or any of its Affiliates, including any know-how, that Licensor discloses or makes available to Licensee under this Agreement, or otherwise becomes known to the Licensee by virtue of this Agreement, and (ii) the terms of this Agreement; provided that Confidential Information shall not include information that:

   (a)   is or becomes generally available to the public other than as a result of disclosure by the Licensee;

   (b)   is already known by or in the possession of Licensee at the time of disclosure by Licensor;

   (c)   is independently developed by Licensee without use of or reference to Licensor's Confidential Information; or

   (d)   is obtained by Licensee from a Third Party that has not breached any obligations of confidentiality.

1.8   "Royalty" means ███████████████████ per cubic centimeter (cc) of Licensed Product compounded regardless of its ultimate disposition.

1.9   "Trade Secret" means confidential or proprietary information with respect to the conduct or details of Licensor including, but not limited to, any technical or nontechnical data, formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan, list of actual or potential customers or suppliers or other information similar to any of the foregoing, which (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can derive economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy as set forth in the Uniform Trade Secrets Act or as set forth under the common law of the State of Florida.

1.10  "Term" means a twelve-month period commencing on the Effective Date of this Agreement, unless this Agreement is terminated earlier in accordance with Section 11 herein.

1.11  "Territory" means the State of Texas.

2.    **GRANT OF RIGHTS**

2.1   Grant of License

(a)   Licensor hereby grants to Licensee, and Licensee hereby accepts upon the terms and conditions set forth in this Agreement, a limited, nontransferable license, nonsublicensable, and non-exclusive right to practice the Licensed Use in the Territory during the Term.

(b)   It is understood and agreed that this license shall pertain only to the Licensed Use and does not extend to any other use of the Licensed Products or the Licensed Methods.

3.   **ROYALTY AND COMPENSATION**

3.1   Royalties and Payments

(a)   In consideration of the rights granted by Licensor herein, Licensee hereby irrevocably agrees to pay Licensor, in accordance with Section 3.1(b), all Royalties accrued both during and after the Term from any source. All Royalties due hereunder shall be paid to Licensor in United States dollars without deductions of any kind.

(b)   Upon compounding of the Licensed Products, Licensee shall, by check or wire transfer, remit to Licensor at the address noted in Section 12.6, full payment of all Royalties due and owing under this Agreement to Licensor. In addition, on a monthly basis, Licensee shall deliver to Licensor a Monthly Report detailing for the applicable month: (i) the quantities purchased of ingredients of the Licensed Products, and (ii) the volume of Licensed Products compounded.

(c)   Licensee shall keep, maintain and preserve in Licensee's principal place of business, during the Term and for two (2) years following the final expiration or termination of this Agreement, complete and accurate books, records and accounts covering all transactions relating to this Agreement, including, without limitation, invoices, correspondence, banking, financial, internal accounting and accounting work papers, and all other pertinent records and accounts relating to the computation or accounting of Royalties (the "Records"). The Records shall be available upon Ten (10) business days' prior notice for inspection and audit at Licensor's sole cost and expense by Licensor or its nominee(s) at any time or times during the Term and for two (2) years thereafter, during reasonable business hours and without undue disruption of Licensee's normal business operations. Licensor's rights shall include examination, copying and making extracts of the Records. Licensee agrees to cooperate with Licensor or Licensor's nominee(s) in the performance of all inspections and audits. Any error or discrepancy discovered in the Records or statements or short-fall or excess in payments made in connection therewith shall immediately be rectified and the appropriate payments made by Licensee to Licensor in the case of a short-fall in payments or to Licensor in the case of an overpayment, together with interest at the then current JPMorgan Chase Bank, N.A. prime rate per annum from the date(s) proper payments were originally due.

(d)   Receipt or acceptance by Licensor or its nominee(s) of any of the statements furnished pursuant to this Agreement, the exercise by Licensor in whole or in part at any time or times of the right to audit and inspect the Records, or the receipt or deposit by Licensor or its nominee(s) of any payment tendered by or on behalf of Licensee shall be without prejudice to any rights or

remedies of Licensor and shall not prevent Licensor from thereafter disputing, within the applicable time period, the accuracy of any such statements, payments, or the Records.

## 4. QUALITY STANDARDS AND CONTROL

### 4.1 Quality Standards

Licensee shall be solely responsible for hiring or contracting with a pharmacist trained and approved by Licensor to compound the Licensed Products exclusively for the Licensed Use by Licensee in strict compliance with all applicable laws and regulations, including but not limited to Section 503A of the Federal Food, Drug, and Cosmetic Act. Ingredients used in the compounding of the Licensed Products shall be exclusively obtained from Licensor and/or from suppliers authorized by Licensor.

### 4.2 Quality Control

Licensee shall insure at all times that the Licensed Products, Materials, Equipment, Literature and Facilities meet Licensor's reasonable and material standards of quality and Licensee shall cooperate fully in all reasonable ways with Licensor in enabling Licensor to ascertain that all Licensed Products, Materials, Equipment, Literature and Facilities meet said standards. By way of example rather than limitation, Licensee shall:

- (a) Upon reasonable notice of Licensor and provision of reasonable liability waivers, allow Licensor, during regular business hours, to inspect any production facility where any Licensed Product is being produced to determine whether Licensee is adhering to the requirements of this Agreement relating to the nature and quality of the Licensed Products and the use of the Licensed Patent and Licensor's rights in connection therewith. It is Licensee's responsibility to ensure that all products are produced in accordance with the terms hereof.

- (b) Upon request of Licensor and at Licensor's sole expense, send to Licensor reasonable quantities of representative samples of Licensed Products for the purposes of testing, inspection and review.

- (c) Upon reasonable notice of Licensor and provision of reasonable liability waivers, allow Licensor, during regular business hours, to inspect any facility or office where Licensee will undertake the Licensed Use to determine whether Licensee is adhering to the requirements of this Agreement relating to the nature and quality of the Licensed Products, Materials, Equipment, Literature and Facilities. It is Licensee's responsibility to ensure that all Licensed Products, Materials, Equipment, Literature and Facilities are in compliance with Licensor's standards.

## 5. CONFIDENTIAL INFORMATION AND TRADE SECRETS

### 5.1 Obligations of Confidentiality

Licensee acknowledges in the course of its relationship with Licensor as a licensee, it has received or will receive and has had or will have access to Confidential Information and Trade Secrets of Licensor, including but not limited to confidential and secret business and marketing plans, strategies and studies, detailed client/customer lists and information relating to the operations and business requirements of those clients/customers and, accordingly, Licensee is willing to enter into the covenants contained in this Section 5 in order to provide Licensor with what Licensee considers to be reasonable protection for Licensor's interests.

5.2   Duration of Confidentiality

Licensee hereby agrees that, during the Term of this Agreement and for a period of two (2) years thereafter, it will hold in confidence all Confidential Information of Licensor that came into its knowledge during the Term and will not disclose, publish or make use of such Confidential Information without the prior written consent of Licensor. Moreover, Licensee shall hold in confidence all Trade Secrets of Licensor that came into its knowledge during the Term and shall not disclose, publish or make use of at any time after the date hereof such Trade Secrets without the prior written consent of Licensor for as long as the information remains a Trade Secret.

5.3   Limitations on Confidentiality

Notwithstanding the foregoing, the provisions of this Section 5 will not apply to information required to be disclosed by Licensee by court order or applicable law. Moreover, the parties agree that the restrictions stated in this Section 5 are in addition to and not in lieu of protections afforded to trade secrets and confidential information under applicable state law. Nothing in this Agreement is intended to or shall be interpreted as diminishing or otherwise limiting the Licensor's right under applicable state law to protect its Trade Secrets and Confidential Information.

**6.   THE LICENSED PATENT**

6.1   Protection and Defense of the Patent

    (a)   Licensee shall cooperate fully with Licensor, at Licensor's sole cost and expense, in the defense and protection of the Patent and shall promptly advise Licensor when Licensee has received written information or otherwise has actual knowledge of any potentially infringing use by any third party or any suit brought, or claim made, against Licensee involving the Licensed Patent. Licensee may not take any action with respect to defense and protection of the Patent or affecting the rights to the Licensed Patent without the prior written consent of Licensor.

    (b)   Nothing in this Agreement will be construed as obligating Licensor to bring or prosecute actions or suits against any third party for patent, copyright or trademark infringement.

    (c)   Licensee and its Affiliates will not, directly or indirectly (including where such is done by a third party on behalf of Licensee or its Affiliates, at the urging of Licensee or its Affiliates or with the assistance of the Licensee or its Affiliates) challenge the validity, scope, or enforceability of or otherwise oppose any right of Licensor in

the Licensed Patent (hereinafter "Licensor Patent Right"), provided that if any Licensor Patent Right is asserted against Licensee or its Affiliate(s) for activities authorized under this Agreement, then such Licensee or its Affiliate(s) is entitled to all and any defenses available to it including challenging the validity or enforceability of such Licensor Patent Right. Licensee will comply with all laws that apply to its activities or obligations under this Agreement.

(d) Nothwithstanding the requirement of Section 6.1(c), if Licensee does bring any such challenge and such a challenge is unsuccessful or otherwise fails, Licensee shall pay all reasonable attorneys' fees incurred by the Licensor in opposing or otherwise responding to such a challenge.

## 7. NONCOMPETE AND NONSOLICITATION.

7.1 Non-competition and Non-solicitation.

During the Term of this Agreement and for a period of two (s) years thereafter, Licensee shall not, directly or indirectly, acting alone or in conjunction with others, anywhere in the United States:

(a) be employed or otherwise engaged in any capacity, in any business in competition with Licensor relating to the Licensed Patent, the Licensed Products, the Licensed Methods or the Licensed Use;

(b) request any parties working for or with Licensor to curtail or cancel their business with Licensor;

(c) solicit, canvass or accept any business or transaction for any other person, firm or corporation or business in competition with Licensor and relating to the Licensed Patent, or the Injectable Technology; or

(d) induce, or attempt to influence, any other person or entity rendering services to, or employee of, Licensor, to terminate their relationship or employment with Licensor or to enter into any employment or other business relationship with any other person (including Licensee), firm or corporation.

7.2 Reasonableness and Irreparable Injury

Licensee acknowledges that:

(a) Licensor's business is highly competitive and requires substantial and continuous expenditures of time and money to develop, market and maintain.

(b) The restrictions contained in this Section 7 are narrow and reasonable in relation to the skills which represent Licensee's principal saleable asset both to the Licensor and to others.

(c) The geographical scope of the provisions of this Section 7 is reasonable, legitimate and fair to Licensee in light of the reasonable length of the non-competition period and non-solicitation period and the Licensor's present strategy and its future needs to market its services and sell its products in a large geographic area in order to have a sufficient customer base to make the Licensor's business profitable and in light of the limited restrictions on the Licensee as set forth herein.

(d)     Any violation of any provision of this Section 7 will result in irreparable injury to Licensor.

7.3 Severability

(a)     The covenants in this Non-compete and Non-solicitation Section 7 are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.

(b)     If any provision of this Section 7 relating to the time period, scope, or geographic area of the restrictive covenants shall be declared by a court of competent jurisdiction to exceed the maximum time period, scope, or geographic area, as applicable, that such court deems reasonable and enforceable, then this Agreement shall automatically be considered to have been amended and revised to reflect such determination.

(c)     All of the covenants in this Section 7 shall be construed as an agreement independent of any other provisions in this Agreement, and the existence of any claim or cause of action Licensee may have against Licensor (other than a material breach of this Agreement by Licensor which has not been cured in accordance with the terms hereof) shall not constitute a defense to the enforcement by Licensor of such covenants.

(d)     Licensee has carefully read and considered the provisions of this Section 7 and, having done so, agrees that the restrictive covenants in this Section 7 impose a fair and reasonable restraint on it and are reasonably required to protect the interests of Licensor and its officers, directors, employees, and stockholders.

## 8. WORK PRODUCT

8.1 Ownership of Work Product.

All work product, property, data, documentation, information or materials conceived, discovered, developed or created by Licensee during the Term and which relates to the Licensed Patent, the Licensed Products, the Licensed Method or the Injectable Technology (collectively, the "Work Product") shall be owned exclusively by the Company. To the greatest extent possible, any Work Product shall be deemed to be a "work made for hire" (as defined in the United States Copyright Act, 17 U.S.C.A. §101 et seq., as amended) and owned exclusively by Licensor. Licensee hereby unconditionally and irrevocably transfers and assigns to Licensor all right, title and interest in or to any Work Product. Moreover, Licensee agrees that any trade secret, invention, improvement, patent applications, copyrighted material, program, system or novel technique or the like conceived, devised, developed or otherwise obtained by Licensee during the Term shall be and become the sole property of Licensor, and that Licensee shall execute any and all documents reasonably necessary to evidence or secure Licensor's ownership of the Work Product.

## 9. REPRESENTATIONS, WARRANTIES AND DISCLAIMERS

9.1     Mutual Representations and Warranties

Each Party represents and warrants to the other Party that, as of the Effective Date:

   (a)   such Party is duly organized and validly existing under the Laws of the jurisdiction of its incorporation or organization;

   (b)   such Party has taken all action necessary to authorize the execution and delivery of this Agreement and the performance of its obligations under this Agreement;

   (c)   this Agreement is a legal and valid obligation of such Party, binding upon such Party and enforceable against such Party in accordance with the terms of this Agreement, except as enforcement may be limited by applicable bankruptcy, fraudulent conveyance, insolvency, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and by general equitable principles; and

   (d)   such Party has all right, power and authority to enter into this Agreement, to perform its obligations under this Agreement.

9.2     Disclaimer of Representations and Warranties

Other than the representations and warranties provided in Section 9.1 above, **LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, CONCERNING THE PATENT RIGHTS AND THE RIGHTS GRANTED HEREUNDER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, VALIDITY OF PATENT RIGHTS CLAIMS, WHETHER ISSUED OR PENDING, AND THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AND HEREBY DISCLAIMS THE SAME. SPECIFICALLY, AND NOT TO LIMIT THE FOREGOING, LICENSOR MAKES NO WARRANTY OR REPRESENTATION (i) REGARDING THE VALIDITY OR SCOPE OF ANY OF THE CLAIM(S), WHETHER ISSUED OR PENDING, OF ANY OF THE PATENT RIGHTS, AND (ii) THAT THE EXPLOITATION OF THE PATENT RIGHTS OR ANY PRODUCT WILL NOT INFRINGE ANY PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF LICENSOR OR OF ANY THIRD PARTY.**

10.     **INDEMNIFICATION; INSURANCE AND LIMITATION OF LIABILITY**

10.1    Indemnification

   (a)   Licensee shall indemnify, defend, and hold harmless Licensor and its directors, officers, employees and agents and their respective successors, heirs and assigns (the "Indemnitees"), against any liability, damage, loss, or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon

      any of the Indemnitees in connection with any claims, suits, actions, demands or judgments arising out of any theory of liability (including without limitation actions in the form of tort, warranty, or strict liability and regardless of whether such action has any factual basis) concerning any product, process, or service that is made, used, or sold pursuant to any right or license granted under this Agreement; provided, however, that such indemnification shall not apply to any liability, damage, loss, or expense to the extent directly attributable to (i) the negligent activities or intentional misconduct of the Indemnitees or (ii) the settlement of a claim, suit, action, or demand by Indemnitees without the prior written approval of Licensee.

    (b)    Procedures. The Indemnitees agree to provide Licensee with prompt written notice of any claim, suit, action, demand, or judgment for which indemnification is sought under this Agreement. Licensee agrees, at its own expense, to provide attorneys reasonably acceptable to Licensor to defend against any such claim. The Indemnitees shall cooperate fully with Licensee in such defense and will permit Licensee to conduct and control such defense and the disposition of such claim, suit, or action (including all decisions relative to litigation, appeal, and settlement); provided, however, that any Indemnitee shall have the right to retain its own counsel, at the expense of Licensee, if representation of such Indemnitee by the counsel retained by Licensee would be inappropriate because of actual or potential differences in the interests of such Indemnitee and any other party represented by such counsel. Licensee agrees to keep Licensor informed of the progress in the defense and disposition of such claim and to consult with Licensor with regard to any proposed settlement.

10.2    Insurance

    (a)    Not later than thirty (30) days before the Licensed Products are compounded for the Licensed Use by Licensee, and at all times thereafter until the expiration of all applicable statutes of limitation pertaining to the administration of the Licensed Products to patients, Licensee will at Licensee's expense, obtain and maintain in full force and effect, comprehensive general liability insurance, including product liability insurance with limits of at least ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ per occurrence with an aggregate of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which shall be non-cancelable except upon thirty (30) days prior written notice to Licensor.

    (b)    Licensee shall provide Licensor with written evidence of such insurance upon request of Licensor. Licensee shall provide Licensor with written notice at least thirty (30) days prior to cancellation, non-renewal or material change in such insurance.

    (c)    This section 7.2 shall survive expiration or termination of this Agreement.

10.3    Limitation of Liability

IN NO EVENT SHALL LICENSOR OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS BE LIABLE TO LICENSEE OR ANY OF ITS AFFILIATES, SUBLICENSEES OR DISTRIBUTORS FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING IN ANY WAY OUT OF THIS AGREEMENT OR THE LICENSE OR RIGHTS GRANTED HEREUNDER, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, INCLUDING WITHOUT LIMITATION ECONOMIC DAMAGES OR INJURY TO PROPERTY OR LOST PROFITS, REGARDLESS OF WHETHER LICENSOR SHALL BE ADVISED, SHALL HAVE OTHER REASON TO KNOW, OR IN FACT SHALL KNOW OF THE POSSIBILITY OF THE FOREGOING.

## 11. TERMINATION

### 11.1 Grounds for Termination

Each Party shall have the right to terminate this Agreement with or without cause thirty (30) days after written notice is delivered to the other Party.

### 11.2 Effects of Termination

On the expiration or sooner termination of this Agreement:

(a) The rights and license granted to Licensee herein shall forthwith terminate and automatically revert to Licensor.

(b) Licensee shall: (i) cease production and use of the Licensed Products; (ii) pay all unpaid Royalties, indemnification amounts and other sums due hereunder (and such obligation shall survive termination of this Agreement); (iii) immediately deliver to Licensor a final Monthly Report; and (iv) dispose of all remaining inventory of the Licensed Products.

(c) The termination or expiration of this Agreement shall not relieve Licensee of any obligation due to Licensor arising or accrued prior to or as of the date of such termination or expiration, including without limitation the obligation to pay Royalties and indemnification amounts, reporting obligations, and restrictions set forth herein.

## 12. MISCELLANEOUS

### 12.1 Entire Agreement

This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof.

### 12.2 Assignment

The rights of Licensee under this Agreement shall not be directly or indirectly assigned, sublicensed, or subcontracted, in whole or in part (whether by operation of law, in bankruptcy or

otherwise) without the prior written consent of Licensor. Any assignment or attempted assignment pursuant to the change of control of Licensee or merger or the sale of the stock, assets or business of Licensee or sale of a product line or division that includes rights to any of the Licensed Products shall not be effective without the prior written consent of Licensor, which consent shall not be unreasonably withheld. Any assignment in violation of this Section shall be null and void.

12.3   Waiver

The failure of either Party to insist upon strict performance of any of the terms and conditions of this Agreement, or delay in exercising any of its remedies, shall not constitute a waiver of any terms or conditions or an acceptance of any default or a waiver of any remedy.

12.4   Relationship of the Parties

Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, or agency relationship between the Parties hereto or shall be deemed to render Licensor liable for any of the debts or obligations of Licensee. Licensee shall in no way be considered an agent or representative of Licensor in neither any dealings Licensee may have with any third party; or neither of the parties hereto nor shall any of their employees or agents have the power or authority to bind or obligate the other Party.

12.5   Severability

If any provision in this Agreement should be or become invalid or unenforceable for any reason whatsoever, the invalidity or unenforceability of such provision shall not affect the validity or enforceability of the remaining provisions and the Parties shall use their best efforts to replace such provision with a valid and enforceable provision.

12.6   Notices

All notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally or one (1) business day after being delivered to a nationally recognized overnight courier with next day delivery specified to the addresses specified below, or at such other address as either Party may supply by written notice delivered in accordance herewith:

| Licensor Address | Licensee Address |
|---|---|
| ██████████ | ██████████ |

### 12.7 Patent Numbers

Licensee shall cause all Licensed Products to be packaged in containers marked with the number of the Licensed Patent to the full extent required by United States law.

### 12.8 Governing Law

The parties agree that jurisdiction and venue in any action brought by any party pursuant to this agreement shall properly and exclusively lie in any federal or state court located in the State of Florida. By execution and delivery of this agreement, each party irrevocably submits to the exclusive jurisdiction of such courts for itself and in respect of its property with respect to such action. The parties irrevocably agree that venue would be proper in such court, and hereby waive any objection that such court is an improper or inconvenient forum for the resolution of such action.

### 12.9 Survival

In addition to any specific survival references in this Agreement, Sections 3, 5, 6, 7, 8, 9.2, 10, 12.8 and 12.9 shall survive termination or expiration of this Agreement. Any other rights, responsibilities, obligations, covenants and warranties which by their nature should survive this Agreement shall similarly survive and remain in effect.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date first written above.



BY: ██████████  
Name: ██████  
TITLE: ██████  
DATE: ██████  

BY: ██████████  
Name: ██████  
TITLE: ██████  
DATE: ██████