# EXHIBIT A

**Vanessa Espinal**

**From:** Loria Medical <info@loriamedical.com>
**Sent:** Thursday, May 21, 2020 2:39 PM
**To:** Loria Medical
**Subject:** FLORIDA BUS - REGISTERED TO DO BUS IN FLORIDA 6-24-16

*Best Regards,*

***Dr. Victor Loria D.O.***
*Cosmetic Dermatologist & Surgeon*

LORIA MEDICAL

**Office:** 786-409-5911| **Toll Free:** 1-877-DR-LORIA|1-877 – 375-6742| **Hours**: Monday-Friday **7am** to **7pm** EST
**Email:** Info@LoriaMedical.com | **Web** LoriaMedical.com|**Address:**3625 NW 82 Ave Ste 402 Miami, FL 33166

**CONFIDENTIALITY NOTICE:** The contents of this email message and any attachments is intended for the use of the person and/or entity to whom it is addressed. This information may be confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is **STRICTLY PROHIBITED**.
**MEDICAL DISCLAIMER:** The Content is not intended to be a substitute for professional medical advice, diagnosis, or treatment and should not be relied on as health or personal advice. Always seek the advice of your physician or other qualified health provider with any questions you may have regarding a medical condition.

---

**From:** Loria Medical
**Sent:** Friday, June 24, 2016 3:18 PM
**To:** john stanise
**Subject:** JOHN STANISE: DR LORIA RESPONSE 6-24-16 3:15PM EST

Good Afternoon John,

Please see my response below….

**From:** john stanise [mailto:lorstanmed@gmail.com]
**Sent:** Friday, June 24, 2016 1:20 PM
**To:** Loria Medical <info@loriamedical.com>
**Subject:** Fwd:

Doc:

Please see the attached agreement for signature. It is updated for names, addresses, product identification and a patent application exhibit page. No changes were made to our agreed terms.

OK…WILL FILE

Also, the patent attorney is ready for a call with you so he can complete the patent search. He is giving me a list of his availabilities so you and I can nail down a time that works for you.

WHEN YOU GET HIS AVAILABLE TIMES LET ME KNOW

To update you, we are now officially formed as a Delaware entity registered to do business in Florida (with your UPS box as our mailing address). Please give me the name and telephone number of your Wells Fargo banker so I can get a meeting set up with him/her and our checking account open.

WELLS FARGO BANKER
ORESTE (OR –REST- TEE) …GO BY FIRST NAME (FORGOT LAST NAME)…ANY ASSOCIATE CAN HELP AS WELL
8201 NW 36th St, Miami, FL 33166
Phone:(305) 597-5800
Hours: Open today · MON – FRI 9AM–6PM


Since I sent the 5K to the patent attorney already, your contribution to our checking account will be $11,666.66 (which represents your 70%). We have about 3K in additional bills (before the Florida registration was done) which need to be paid, so after that we will have about 8.6K for ongoing expenses.

I WILL SEND YOU A CHECK TO LORSTAN PHARMACEUTICAL LLC FOR $11,666.66

John



---------- Forwarded message ----------
From: **John Stanise** <JStanise@jmscpa.com>
Date: Fri, Jun 24, 2016 at 12:25 PM
Subject:
To: "lorstanmed@gmail.com" <lorstanmed@gmail.com>




**John Stanise, CPA**

*John M. Stanise, CPA, PC*

*317 Courtland Avenue*

*Stamford, CT 06906*

*Tel: (203) 323-5311*

*Fax: (203) 327-2494*

jstanise@jmscpa.com

CIRCULAR 230 DISCLAIMER: Any tax advice contained in the body of this material was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

# EXHIBIT B

**Vanessa Espinal**

**From:** Loria Medical <info@loriamedical.com>
**Sent:** Thursday, May 21, 2020 8:59 AM
**To:** Loria Medical
**Subject:** STANISE CONN CORP ADDRESS... WILL USE IT FOR NOW... LIKE NO BIG DEAL 1-15-19

*Best Regards,*

***Dr. Victor Loria D.O.***
*Cosmetic Dermatologist & Surgeon*

LORIA MEDICAL

**Office:** 786-409-5911| **Toll Free:** 1-877-DR-LORIA|1-877 – 375-6742| **Hours**: Monday-Friday **7am** to **7pm** EST
**Email:** Info@LoriaMedical.com | **Web** LoriaMedical.com|**Address:**3625 NW 82 Ave Ste 402 Miami, FL 33166

**CONFIDENTIALITY NOTICE:** The contents of this email message and any attachments is intended for the use of the person and/or entity to whom it is addressed. This information may be confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is **STRICTLY PROHIBITED**.
**MEDICAL DISCLAIMER:** The Content is not intended to be a substitute for professional medical advice, diagnosis, or treatment and should not be relied on as health or personal advice. Always seek the advice of your physician or other qualified health provider with any questions you may have regarding a medical condition.

---

**From:** John Stanise
**Sent:** Tuesday, January 15, 2019 3:33 PM
**To:** Loria Medical
**Subject:** RE: JOHN STANISE: LORSTAN PHARMACEUTICAL LLC ....name correct?

Singular.

Lorstan Pharmaceutical, LLC
5 River Road, Suite 211
Wilton, CT 06897
(This is not our physical location. It is my UPS store address that accepts mail and signs for packages. Our physical office is in the same shopping center).

Or

Lorstan Pharmaceutical. LLC
10773 NW 58th Street, Suite 751
Doral, FL 33178
(I am assuming you are still maintaining the post box. Please confirm. Also, is it a UPS store?)

We will use Wilton as the business address for now and we recently registered to do business here in CT (needed to because of staff payroll). Hopefully Miami will be my next stop in life (because of this venture). I will absolutely start taking up residency in FL when revenue turns substantial, or as we get closer to going public, or if a sale to big pharma is imminent. There is no way that I will pay state income tax in any of the above circumstances.

John


**John Stanise, CPA**
*Chief Executive Officer*
*Lorstan Pharmaceutical, LLC*
*5 River Road, Suite 211*
*Wilton, CT 06897*
*Cell: (203) 536-9407*
john.stanise@lorstan.com

CONFIDENTIALITY NOTICE: This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please delete it from your system.

---

**From:** Loria Medical <info@loriamedical.com>
**Sent:** Tuesday, January 15, 2019 8:16 AM
**To:** John Stanise <john.stanise@Lorstan.com>
**Subject:** JOHN STANISE: LORSTAN PHARMACEUTICAL LLC ....name correct?

John,

I do not remember if we called to company Lorstan Pharmaceutical or Lorstan Pharmaceuticals…..singular, correct?

The banking record says Pharmaceutical….

Dr Loria

# EXHIBIT C

# Electronic Articles of Organization For Florida Limited Liability Company

L19000237671
FILED 8:00 AM
September 19, 2019
Sec. Of State
kepage

## Article I

The name of the Limited Liability Company is:

FL FACILITIES RENTAL LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1717 BLANDING BLVD, SUITE 102
JACKSONVILLE, FL. US 32210

The mailing address of the Limited Liability Company is:

5 RIVER ROAD, SUITE 211
WILTON, CT. US 06897

## Article III

The name and Florida street address of the registered agent is:

JOHN M STANISE
1717 BLANDING BLVD, SUITE 102
JACKSONVILLE, FL. 32210

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature: JOHN M STANISE

L19000237671
FILED 8:00 AM
September 19, 2019
Sec. Of State
kepage

## Article IV

The name and address of person(s) authorized to manage LLC:

Title: MGR
JOHN M STANISE
68 WOLFPIT ROAD
WILTON, CT. 06897 US

Title: MGR
VICTOR LORIA
10773 NW 58TH STREET, SUITE 751
DORAL, FL. 33178 US

## Article V

The effective date for this Limited Liability Company shall be:

09/19/2019

Signature of member or an authorized representative

Electronic Signature: JOHN STANISE

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# EXHIBIT D

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

**FOR**

**FL Facilities Rental, LLC**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| SECTION 1.1 | Certain Definitions | 1 |
| ARTICLE II | ORGANIZATIONAL MATTERS | 2 |
| SECTION 2.1 | Legal Status | 2 |
| SECTION 2.2 | Name | 2 |
| SECTION 2.3 | Purpose | 2 |
| SECTION 2.4 | Term | 2 |
| ARTICLE III | MEMBERS AND MEBERSHIP INTERESTS | 2 |
| SECTION 3.1 | Initial Members | 2 |
| SECTION 3.2 | Additional Membership Interests and Transfer of Membership Interests | 3 |
| ARTICLE IV | CAPITAL CONTRIBUTIONS | 3 |
| SECTION 4.1 | Capital Contributions | 3 |
| SECTION 4.2 | Loans | 3 |
| SECTION 4.3 | Return of Contributions; Interest | 3 |
| ARTICLE V | DISTRIBUTIONS | 3 |
| SECTION 5.1 | General | 3 |
| SECTION 5.2 | Timing of Distributions | 3 |
| SECTION 5.3 | Distributions in Kind | 3 |
| ARTICLE VI | TAX ALLOCATIONS AND OTHER MATTERS | 4 |
| SECTION 6.1 | General | 4 |
| SECTION 6.2 | Tax Matters Partners | 4 |
| ARTICLE VII | MANAGEMENT | 4 |
| SECTION 7.1 | Management of the Company | 4 |
| SECTION 7.2 | Powers and Authorities of the Managers | 4 |
| SECTION 7.3 | Appointment of Officers; Delegation of Authority | 5 |
| SECTION 7.4 | Action by the Members | 5 |
| SECTION 7.5 | Limitation on Authority of Members | 6 |
| SECTION 7.6 | Authority Retained by the Members | 6 |
| ARTICLE VIII | EXCULPATION AND INDEMNIFICATION | 6 |
| SECTION 8.1 | Exculpation | 6 |
| SECTION 8.2 | Indemnification | 7 |
| ARTICLE IX | BOOKS AND RECORDS | 8 |
| SECTION 9.1 | Books and Records | 8 |
| SECTION 9.2 | Bank Accounts | 8 |
| SECTION 9.3 | Accounting Methods | 8 |

SECTION 9.4 Fiscal Year ........ 8

ARTICLE X TRANSFER OF INTERESTS ........ 8

SECTION 10.1 Transfers ........ 8

SECTION 10.2 Restrictions ........ 8

SECTION 10.3 Limitations ........ 9

ARTICLE XI WITHDRAWAL AND REDEMPTION ........ 9

SECTION 11.1 Withdrawal ........ 9

SECTION 11.2 Redemption ........ 9

SECTION 11.3 Exercise of Option ........ 9

ARTICLE XII DISSOLUTION ........ 11

SECTION 12.1 Events of Dissolution ........ 11

SECTION 12.2 Distributions ........ 11

SECTION 12.3 Conduct of Winding-Up ........ 11

ARTICLE XIII GENERAL PROVISIONS ........ 11

SECTION 13.1 Remedies ........ 11

SECTION 13.2 Waiver ........ 11

SECTION 13.3 Notice ........ 11

SECTION 13.4 Entire Agreement ........ 12

SECTION 13.5 Amendments and Modifications ........ 12

SECTION 13.6 Binding Effect: Benefits ........ 12

SECTION 13.7 Separability ........ 12

SECTION 13.8 Headings ........ 12

SECTION 13.9 Counterparts ........ 12

SECTION 13.10 Governing Law ........ 12

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**FL FACILITIES RENTAL, LLC**

This **LIMITED LIABILITY COMPANY OPERATING AGREEMENT** (this "Agreement") for **FL FACILITIES RENTAL, LLC** (the "Company"), effective as of September 18, 2019, is by among the Company and the undersigned parties, as members of the Company (the "Initial Members").

## RECITALS

**WHEREAS**, the Company was formed as a limited liability company, governed by the Florida Limited Liability Company Act, as amended from time to time (the "Act"), under the name of **FL FACILITIES RENTAL, LLC** by the filing of the Articles of Organization with the Secretary of State of Florida on September 19, 2019; and

**WHEREAS**, the parties hereto will conduct the Company business under this Agreement which shall govern the rights and duties of the Initial Members and future Members of the Company, and which constitutes the entire agreement from and after September 19, 2019.

## AGREEMENTS

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants of the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and the Company hereby agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.1 Certain Definitions. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Act" has the meaning set forth in the recitals to this Agreement.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Capital Contribution", in respect of any Member, means the aggregate amount of cash and any other property contributed to the Company by or on behalf of that Member.

"Code" means the Internal Revenue Code of 1986, as amended and corresponding provisions of future laws.

"Indemnitee" has the meaning set forth in Section 8.2(a).

"Initial Capital Contribution" has the meaning set forth in Section 4.1.

"Initial Members" has the meaning set forth in the preamble to this Agreement.

"Managers" means the individual(s) who is authorized to manage the business and affairs of the Company pursuant to Article VII hereof.

"Member" means the Initial Members and each other Person that has been admitted to the Company as a Member in accordance with the provisions hereof.

"Percentage Interest", with respect to any Member, means the percentage for each Member set forth in the column marked "Percentage Interest" on Schedule A, as amended from time to time.

"Person" means any individual, partnership, corporation, limited liability company, joint venture, trust, association or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Proceeding" has the meaning set forth in Section 8.2(a).

"Requisite Percentage" means not less than sixty-six and 2/3 percent (662/3%) of the Percentage Interests.

"Transfer" means any transfer, sale, assignment, pledge, encumbrance or other disposition, irrespective of whether any of the foregoing is effected voluntarily, by operation of law or otherwise, or whether in inter vivos or upon death.

## ARTICLE II
## ORGANIZATIONAL MATTERS

SECTION 2.1    Legal Status.  The Company is a limited liability company organized and existing under the Act.  The Members shall take such steps as are necessary (a) to maintain the Company's status as a limited liability company formed under the laws of the State of Florida and qualified to conduct business in any jurisdiction where the Company does business and is required to be so qualified, and (b) ensure that the Company shall continue to be treated as a partnership for tax purposes.

SECTION 2.2    Name.  The name of the Company is **FL FACILITIES RENTAL, LLC** The Members may change the name of the Company at any time and from time to time.

SECTION 2.3    Purpose.  The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which limited liability companies may be organized under the Act as the same may be amended from time to time.

SECTION 2.4    Term.  The term of the Company commenced on the date the Articles of Organization was filed for record with Secretary of State, in the State of Florida, and shall continue until the Company is dissolved pursuant to Article X hereof.

## ARTICLE III
## MEMBERS AND MEBERSHIP INTERESTS

SECTION 3.1       Initial Members.  The names of the Initial Members are set forth on Schedule A.

SECTION 3.2       Additional Membership Interests and Transfer of Membership Interests.  Following the date of this Agreement, upon the approval of Members holding at least the Requisite Percentage, the Company may issue additional membership interests and admit to the Company as Members those Persons to whom such membership interests are issued, and shall admit any Person to whom an existing Member Transfers membership interests. Membership interests shall be issued for such consideration as shall be determined by the Members at the time of issuance.  Members admitted to the Company in connection with the issuance of additional membership interests shall have such rights, duties and obligations as may be established by the Members in connection with the admission of such additional Members.  In the event that an additional Member is admitted, then Schedule A shall be amended to identify such Member's name, address and Percentage Interest of the Company.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

SECTION 4.1       Capital Contributions.  The Capital Contributions of the members shall be as reflected on the books of the company from time to time. No Member shall be required to make any Capital Contribution, other than the Initial Capital Contribution. A capital account shall be maintained for each Member, to which contributions and profits shall be credited and against which distributions and losses shall be charged.  Notwithstanding any other provision of this Agreement, the capital accounts shall be maintained in accordance with Treasury Regulations 1.704-1(b)(2)(iv).

SECTION 4.2       Loans.  Any Member may make loans to the Company at such times and on such terms as are agreed upon by the Members.

SECTION 4.3       Return of Contributions; Interest.  A Member shall not have a separate right to receive a return of such Member's Capital Contributions (including such Member's Initial Capital Contribution) or to receive interest thereon, but shall have such distribution rights as are provided herein.

## ARTICLE V
## DISTRIBUTIONS

SECTION 5.1       General.  Distributions shall be made to the Members pro rata in accordance with their respective Percentage Interests.

SECTION 5.2       Timing of Distributions.  Subject to applicable law, the Manager shall determine whether, when and to what extent distributions shall be made.  Distributions made within 90 days following the close of the Company's fiscal year may be designated by the Manager as being in respect of such fiscal year.

SECTION 5.3 Distributions in Kind. Subject to applicable law, distributions of property other than cash may be made in the discretion of the Manager. Distributions of property shall be valued at the fair market value of the net equity therein as determined by the Manager.

## ARTICLE VI
## TAX ALLOCATIONS AND OTHER MATTERS

SECTION 6.1 General. All allocations for income tax purposes of items of income, gain, loss, deduction, credit, basis adjustment and the like for any taxable year of the Company shall be in pro rata in accordance with their respective Percentage Interests.

SECTION 6.2 Tax Matters Partners. Unless otherwise required by law, the tax matters partner within the meaning of section 6231(a)(7) of the Code shall be a Member designated from time to time by the Managers. Unless otherwise provided in this Agreement, all tax and accounting determinations and elections shall be made reasonably and in good faith by such designated individual (or his successor as tax matters partner) for the benefit of all Members. The initial Tax Matters Partner shall be John Stanise.

## ARTICLE VII
## MANAGEMENT

SECTION 7.1 Management of the Company.

(a) The business and affairs of the Company shall be managed exclusively by its Managers and by such officers of the Company, if any, as may be appointed from time to time by the Managers pursuant to this Article VII. Except where the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of the Act, the Managers shall have full and complete authority, power and discretion to direct, manage and control the business, affairs and properties of the Company acting by a majority of their number. Each Member shall appoint one (1) Manager. The initial Managers are Dr. Victor Loria and John Stanise.

(b) Each Manager is an agent of the Company for the purpose of carrying on in the usual way the business of the Company, and the act of a Manager, including the execution in the Company name of any instrument for carrying on in the usual way the business of the Company, binds the Company, unless such act is in contravention of the Company's Articles of Organization or this Agreement or unless the Manager so acting otherwise lacks the authority to act for the Company, and the person with whom the Manager is dealing has knowledge of the fact that the Manager has no such authority.

(c) The Managers shall not be required to manage the Company as his or her sole and exclusive full time work and may have other business and investment interests and activities in addition to those relating to the Company.

(d) A Manager may resign at any time by giving written notice to the Company. The resignation of a Manager who is also a Member shall not affect such individual's

rights as a Member and shall not constitute a withdrawal of a Member. A Manager may be removed by the affirmative vote of two-thirds of the Members.

(e) The Managers shall be entitled to receive such salary and other compensation as shall be approved by the Members and the Company shall pay the reasonable out-of-pocket expenses incurred by the Managers in connection with discharging any of his other duties as Managers upon submission to the Company of appropriate receipts or other evidence of payment.

SECTION 7.2 Powers and Authorities of the Managers. Management of the Company shall be vested in the Managers. The day-to-day business and affairs of the Company shall be managed by or under the direction of the Managers. Except as delegated to the officers of the Company or as otherwise provided in this Agreement, including in Section 7.6, all decisions, determinations, actions, approvals or consents relating to the management and control of the conduct of the business of the Company and its affairs shall be made by the Managers, including, but not limited to, decisions, determinations, actions, approvals and consents relating to any of the following: (a) the selection of representatives of the Company to serve on the management, or other governing boards or bodies of any company or other organization in which the Company owns an interest; (b) distributions to Members; (c) the opening of bank accounts, the making of loans to any third party, the incurrence or refinancing of indebtedness of the Company, and the encumbering of Company property; (d) the selection of attorneys, accountants, appraisers and agents; and (e) the entry into or performance of, on behalf of the Company, all other contracts, agreements and other undertakings and the taking of any other action as may be necessary or advisable in the judgment of the Managers or its designees or incident to carrying out the business of the Company. Any contract, agreement, instrument or other document to which the Company is a party and which is duly authorized by the Company shall be signed by the Managers or an authorized officer, and no other signatures shall be required.

SECTION 7.3 Appointment of Officers; Delegation of Authority. In connection with the management of the business and affairs of the Company, the Managers shall have the responsibility and authority to hire and fire officers of the Company and delegate to officers limited power and authority (except with respect to the matters reserved for decision by the Members under Section 7.6 or elsewhere in this Agreement), to do all things and on such terms as they, in their reasonable discretion and subject to the terms of this Agreement, deem necessary or appropriate to conduct the Business and to exercise all powers and to effectuate the purpose set forth in Section 2.3.

SECTION 7.4 Action by the Members.

(a) Right to Call. Meetings of the Members may be called by the Managers or any Member. Meetings of the Members shall be called upon delivery to the Members of notice of a meeting given in accordance with Section 7.4(b) below.

(b) Notice of Meetings. The Managers or Member calling the meeting shall deliver or mail written notice stating the date, time and place of any meeting of the Members and a description of the purposes for which the meeting is called, to each Member, at such address as

appears in the records of the Company at least five (5), but no more than fifteen (15), days before the date of the meeting.

(c) Waiver of Notice. A Member may waive notice of any meeting, before or after the date and time of the meeting as stated in the notice, by delivering a signed waiver to the Company for inclusion in the minutes or by being present at such meeting. A Member's presence at any meeting (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within the purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(d) Presence. Any or all Members may participate in any meeting by, or through the use of, any means of communication by which all Members participating may simultaneously hear each other during the meeting. A Member so participating is deemed to be present in person at the meeting.

(e) Quorum; Approval. The presence of Members holding at least the Requisite Percentage is necessary for a quorum. Unless otherwise specified in this Agreement or required by law, any action proposed to be taken by the Members shall be approved only upon the affirmative vote of Members holding at least the Requisite Percentage (or the approval of the Members owning the required number of Percentage Interests of the Company as specified by this Agreement or required by law).

(f) Action by Written Consent. Any action required or permitted to be taken at a meeting of the Members may be taken without such meeting, without prior notice and without a vote, by written consent, setting forth the action so taken, signed by Members holding at least the Requisite Percentage (or representing Members owning the required number of Percentage Interests of the Company as specified by this Agreement or required by law).

SECTION 7.5 Limitation on Authority of Members. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. This Section 7.5 supersedes any authority granted to the Members pursuant to the Act. Any Member who takes any action or binds the Company in violation of this Section 7.5 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

SECTION 7.6 Authority Retained by the Members. The Members shall vote only on those matters referred to them by the Managers. All Members (other than Assignees) who have not Dissociated shall be entitled to vote on any matter submitted to a vote of the Members by the Managers.

## ARTICLE VIII
## EXCULPATION AND INDEMNIFICATION

SECTION 8.1 Exculpation. No Managers or officer of the Company shall be liable to the Company or to any Member for any action taken with respect to the Company so long as

such Managers or officer (a) acted in good faith and in a manner he or she reasonably believed to be in the best interests of the Company, (b) was neither grossly negligent nor engaged in willful malfeasance, (c) did not breach this Agreement in any material respect and (d) did not violate any material law.  The Managers shall be fully protected and justified with respect to any action or omission taken or suffered by him or her in good faith if such action or omission was taken or suffered in reliance upon and in accordance with the opinion or advice as to matters of law, of legal counsel or, as to matters of accounting, of accountants selected with reasonable care.

SECTION 8.2    Indemnification.

(a)    Subject to the limitations set forth in this Article VIII, the Company shall indemnify and hold harmless to the fullest extent permitted by law any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person is or was a Managers or officer, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other entity or enterprise (each, an "Indemnitee"), against any loss, damage, liability or expense (including attorneys' fees, costs of investigation and amount paid in settlement) incurred by or imposed upon the Indemnitee in connection with any action, suit or proceeding, unless it shall have been finally adjudicated that the Indemnitee (i) did not act in good faith and in a manner that such Indemnitee reasonably believed to be in the best interest of the Company, (ii) was either grossly negligent or engaged in willful malfeasance, (iii) breached this Agreement in any material respect or (iv) violated any material law.  Notwithstanding the foregoing, no indemnification shall be payable hereunder to any Indemnitee in respect of any action in which such Indemnitee is a plaintiff, other than an action for indemnification under this Section 8.2.

(b)    The Company shall pay the expenses incurred by an Indemnitee in defending any action, suit or proceeding, or in opposing any claim arising in connection with any potential or threatened action, suit or proceeding, in each case for which indemnification may be sought pursuant to this Article VIII, in advance of the final disposition thereof, upon receipt of a written undertaking by such Indemnitee to repay such payment if it shall be determined that such Indemnitee is not entitled to indemnification therefor as provided herein.

(c)    The rights to indemnification and advancement of expenses conferred in this Section 8.2 shall (i) not be exclusive of any other right which any Indemnitee may have or hereafter acquire under any law, statute, rule, regulation, charter document, by-law, contract or agreement and shall inure to the benefit of the executors, administrators, personal representatives, successors and permitted assigns of each such Indemnitee; and (ii) shall continue as to an Indemnitee even if such person ceases to be a Managers or officer of the Company.

(d)    Recourse by an Indemnitee for indemnity under this Section 8.2 shall be only against the Company as an entity and no Member shall by reason of being a Member be liable for the Company's obligations under this Section 8.2.

(e) Rights and benefits conferred on an Indemnitee under this Section 8.2 shall be considered a contract right and shall not be retroactively abrogated or restricted without the written consent of the Indemnitee affected by the proposed abrogation or restriction.

(f) The Company, at the direction of the Managers, may indemnify and advance expenses to a Member, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to a Managers or officer under this Section 8.2.

(g) If this Article VIII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article VIII as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any such proceedings, appeal, inquiry or investigation to the full extent permitted by any portion of this Article VIII that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE IX
## BOOKS AND RECORDS

SECTION 9.1 Books and Records. Proper and complete books and records of the Company, in which shall be entered fully and accurately the transactions of the Company, shall be kept and maintained at all times at the principal offices of the Company or, subject to the provisions of the Act, at such other place as the Managers may from time to time determine.

SECTION 9.2 Bank Accounts. Funds of the Company shall be used only for Company purposes and shall be deposited in such accounts in banks or other financial institutions as may be established from time to time by the Managers. Withdrawals shall be made by such Persons as are designated from time to time by the Managers.

SECTION 9.3 Accounting Methods. The Company shall use generally accepted accounting principles.

SECTION 9.4 Fiscal Year. The fiscal year of the Company shall end on December 31st of each year.

## ARTICLE X
## TRANSFER OF INTERESTS

SECTION 10.1 Transfers. Subject to Section 10.2, no Member may Transfer its Membership Interest without the approval of the Managers and the Requisite Percentage of the Members.

SECTION 10.2 Restrictions. Notwithstanding Section 10.1, a Transfer shall not be treated as permitted unless and until the following conditions are satisfied:

(a) Except in the case of an involuntary Transfer or a Transfer by operation of law, the transferor and transferee shall execute and deliver to the Company such documents

and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer, including execution of a Joinder, agreeing to be bound by the terms and conditions of this Agreement. In the case of an involuntary Transfer or a Transfer by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses (including attorneys' fees and expenses) that it reasonably incurs in connection with such Transfer;

(b) The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interest transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information, statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any Distribution otherwise provided for in this Agreement with respect to any transferred interest until it has received such information.

SECTION 10.3 Limitations. Notwithstanding anything to the contrary herein, no Transfer shall be permitted, nor shall any transferee become a beneficial owner pursuant to a Transfer, if such Transfer would cause (i) the Company to be treated as a publicly traded partnership within the meaning of Section 7704 of the Code; (ii) the Company to have more than 100 members (as determined either for purposes of Section 7704 of the Code, including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3), or for purposes of the Investment Company Act of 1940, as amended); (iii) noncompliance by the Company with any applicable law, including any applicable securities laws; or (iv) any effect on the Company's existence or qualification as a limited liability company under the Act.

## ARTICLE XI
## DISSOLUTION

SECTION 11.1 Events of Dissolution. The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following: (a) the unanimous written consent of the Members in accordance with this Agreement; or (b) the entry of a decree of judicial dissolution of the Company under the Act.

SECTION 11.2 Distributions. The assets of the Company on winding-up shall be applied first to the expenses of the winding-up, and thereafter all of the remaining assets of the Company shall be distributed in the following order: (a) first, to creditors of the Company, including any Member who is also a creditor, in the order of priority as provided by law; and (b) thereafter, to the Members, pro rata in accordance with their respective capital accounts.

SECTION 11.3 Conduct of Winding-Up. The winding-up of the business and affairs of the Company shall be conducted by the Managers except as otherwise required by law.

## ARTICLE XII
## GENERAL PROVISIONS

SECTION 12.1 Remedies. In any action to enforce this Agreement or to seek damages on account of any breach hereof, the prevailing party shall be entitled to reimbursement for its costs of collection (including reasonable attorney's fees and expenses). No remedy conferred upon any party to this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

SECTION 12.2 Waiver. None of the terms of this Agreement shall be deemed to have been waived by any party hereto, unless such waiver is in writing and signed by that party. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or any further breach of the provision so waived.

SECTION 12.3 Notice. All notices and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be delivered personally or by certified mail (return receipt requested), or telecopied and addressed, if to a Member, to such Member or his or her personal representative at the address set forth for such Member on Schedule A, or to such other address as any of the above shall have specified by notice hereunder. Each notice or other communication shall be deemed sufficiently given, served, sent, received or delivered for all purposes at such time as it is delivered to the addressee (with the return receipt, the delivery receipt or the affidavit of messenger being deemed conclusive, but not exclusive, evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

SECTION 12.4 Entire Agreement. This Agreement contains the entire agreement, and supersedes all prior agreements and understandings and arrangements, oral or written, among the parties hereto with respect to the subject matter hereof.

SECTION 12.5 Amendments and Modifications. This Agreement may be modified, amended or changed in any respect with the consent of Members holding at least the Requisite Percentage.

SECTION 12.6 Binding Effect: Benefits. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.

SECTION 12.7 Separability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be unenforceable or invalid under applicable law, such provision shall be ineffective only to the extent of such unenforceability or invalidity, and the remaining provisions of this Agreement shall continue to be binding and in full force and effect.

SECTION 12.8 Headings. The section and other headings contained in this Agreement are for convenience only and shall not be deemed to limit, characterize or interpret any provisions of this Agreement.

SECTION 12.9 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed to be an original, and all of which shall be taken to be one and the same instrument with the same effect as if each of the parties hereto had signed the same signature page.

SECTION 12.10 Governing Law. This Agreement and the rights of the parties hereunder shall be construed and interpreted in accordance with the laws of the State of Florida applicable to agreements made and to the performance wholly within that jurisdiction.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY**

FL Facilities Rental, LLC

By____________________
John Stanise, Manager

____________________
Dr. Victor Loria, Member

____________________
John Stanise, Member



**MEMBERS**

**Schedule A**

**Name, Address and Percentage Interests of Members**

| Member and Address | Percentage Interest |
| --- | --- |
| Dr. Victor Loria<br>3625 NW 82nd Ave., Suite 402<br>Miami, FL 33166 | 70% |
| John Stanise<br>5 River Rd., Suite 211<br>Wilton, CT 06897 | 30% |



# EXHIBIT E

# LEASE

THIS AGREEMENT OF LEASE made effective as of the **19st** day of **September, 2019** by and between:

**FL Facilities Rental, LLC**
5 River Road, Suite 211
Wilton, CT 06897
(hereinafter referred to as **"Tenant"**)

and

**Brian Phillips Properties, LLC**
c/o Benchmark Asset Services
4348 Southpoint Boulevard, Suite 310
Jacksonville, FL 32216

(hereinafter referred to as **"Landlord"**)

WITNESSETH:

1. Premises. Landlord hereby leases to Tenant and Tenant accepts from Landlord, for the period of time and upon the terms and conditions set forth in this Lease, the space in the Blanding Professional Office Center which is defined as:

1717 Blanding Blvd, Suite 102
Jacksonville, FL 32210

2. Rent. Tenant shall pay rent on a monthly basis, payable in advance on or before the first day of each month by check to:

**Brian Phillips Properties, LLC**
Attn: Benchmark Asset Services
4348 Southpoint Boulevard, Suite 310
Jacksonville, FL 32216

The amount of **base** monthly rent shall be as follows:

**$ 622.59** for the period of **September 19, 2019** through **November 1, 2021**

Tenant shall also pay any applicable sale and use taxes required by Taxing Authorities (which is currently 6.7%).

In the event of any payment of rent posted 5 or more days after it is due, Tenant shall pay a $35.00 fee and ten percent interest thereon until paid in full. Tenant shall pay a $35.00 returned check fee on all returned checks.

Tenant shall pay one prorated month's rent of **$249.04** plus applicable sales tax in advance.

Tenant will pay to Landlord the total sum of **$622.59** representing payment of a **security deposit**, which is in addition to rent.

Tenant has requested and Landlord has agreed that the Tenant shall have free rent during **October 2019 and November 2019.**

3. Term. The term of this Lease Agreement shall be for the period beginning **September 19, 2019** through **November 1, 2021.**

4. Option to Renew. Landlord hereby grants unto Lessee an option to renew this Lease after the initial term for **two- two year terms**. Tenant's option to renew hereunder is conditioned upon Tenant giving Landlord not less than ninety (90) days written notice prior to the expiration of the initial term of the lease under the above referenced terms.

5. Covenants of Landlord. Landlord warrants and represents that it has the right to lease the Premises for the aforesaid term on the terms and conditions herein contained. Landlord covenants and agrees that Tenant, on timely paying the rent and performing the other covenants herein set forth, shall be entitled to make use of the Premises for the purpose of Tenants primary business for the term aforesaid free of interference from Landlord in the quiet us and enjoyment of the Premises. Landlord represents and warrants that it has no actual knowledge of any violation regarding the Americans with Disabilities Act requirements in connection with handicapped accessibility.

6. Covenants of Tenant. Tenant covenants and agrees to pay the specified rent, and upon expiration of the term to remove its goods and effects and peacefully deliver the Premises to Landlord in as good condition as it existed on the date this Lease Agreement commenced, except for ordinary wear and tear.

Tenant shall use the Premises only to conduct its business and shall conform to all valid laws, ordinances and government regulations affecting the conduct of Tenants business on the Premises and shall not make any loud or noxious noises or odors, shall make no illegal, offensive, disturbing or immoral use of the Premises and shall create no hazards, nuisances, or excessive trash and litter, shall not store any products, machinery, equipment or other property outside the Premises without the consent of Landlord, nor shall be engaged in any activity which will materially increase Landlord's hazard insurance costs.

7. Repairs and Maintenance. Tenant acknowledges that the interior of premises are in good order and repair, unless otherwise indicated herein. Tenant shall, at his own expense and at all times, maintain the premises in good and safe condition, including plate glass, electrical wiring, plumbing, heating and cooling installations, AC filters, ceiling tiles, lighting, smoke detectors, fire extinguishers, and any other system or equipment upon the premises and shall surrender the same, at termination hereof, in as good condition as received, normal wear and tear accepted. Tenant shall be responsible for all repairs required, except the roof, exterior walls, structural foundations, parking and common areas. Landlord will do all repairs to the existing heating and cooling unit and will purchase a new heating and cooling unit if the existing unit cannot maintain a sixty-eight degree cooling temperature for the space. Tenant will be responsible for repairs to the new heating and cooling unit.

8. Indemnification. Tenant hereby agrees to and shall indemnify and hold harmless Landlord from and against any and all claims, loss, damages, causes of action, suits, and liability of every kind arising out of or in connection with Tenant's performance of Tenants obligations under the terms of this Agreement.

9. Tenants Utilities, Taxes and Use of the Premises. Tenant will pay for all electricity used by it on the Premises. Tenant will pay all taxes levied or assessed upon its stock in trade or fixtures. In using the Premises, Tenant will conform to all valid laws, ordinances and government regulations affecting the business conducted by Tenant on the Premises, and shall create no hazards, nuisances, or excessive trash or litter, nor shall be engaged in any activity which will materially increase Landlord's hazard insurance costs. Tenant shall make no major structural changes in the Premises without the prior written consent of the Landlord. Janitorial services are to be provided by Tenant, at Tenant's sole expense. Landlord shall be responsible for and pay all water and sewer charges in connection with the property in question.

10. Alterations or Improvements by Tenant (Trade Fixtures, etc.). If any alterations or improvements except painting or wall papering, are made at Tenants' expense, or if Tenant shall install or acquire ownership of previously installed shelving, lighting fixtures, removable partitions, trade fixtures, machinery and equipment, or advertising signs, they shall remain Tenants property and may be removed prior to termination of Tenants occupancy. Tenant shall provide a floor plan for any/all alterations

Tenant shall repair any damage occasioned by removal of any fixtures, partitions, shelving, etc. removed at the termination or expiration of this Lease and leave the premises in satisfactory condition, normal wear and tear excepted.

11. Casualty Insurance. Landlord shall obtain, maintain and pay for fire and general liability insurance on the Premises. Tenant shall obtain, maintain and pay for fire, and extended coverage insurance covering Tenants property located within the Premises. Neither party shall be liable to the other for loss or damage caused by fire or any other peril insured against under standard extended coverage insurance unless the loss or damaged is caused by the party's negligence.

12. Assignment of Sublease. Tenant shall have the option to assign or sublease the Lease Agreement with Landlord's consent, which will not be unreasonably withheld or delayed. The assignee, subletee or replacement tenant must have credit of equal or greater quality of Tenant. Tenant is not allowed to assign this Lease Agreement or sublet the Premises without the prior written consent of Landlord. An assignment shall not relieve Tenant of its obligations under this Lease Agreement.

13. Right of Entry by Landlord. Landlord may, during the term of this Lease Agreement and during usual business hours, and without unreasonably interfering with Tenant's business, enter the Premises to view them and to make such repairs as may be required, and, may upon reasonable notice show the Premises to others for the purpose of rental or sale, and may affix to suitable parts of the Premises a notice of Landlord's intention to lease or sell the Premises providing same does not unreasonably interfere with conduct of Tenant's business.

14. Fire or Casualty. If the Premises are damaged by fire or other casualty, Landlord, at his expense, will promptly repair the damage and restore the Premises to their condition immediately prior to the occurrence of the casualty. But if the cost for any such restoration or repair is more than the proceeds of insurance paid to Landlord, Landlord shall have the option to terminate this Lease Agreement by giving written notice of termination to Tenant within thirty (30) days after the date of the casualty. If Tenant is unable to occupy the Premises and if the time to repair the Premises is more than two (2) months from the date of the casualty, then Tenant may terminate this Lease Agreement by written notice to Landlord within thirty (30) days after the casualty. If Premises are damaged by fire or other casualty not caused by negligence of Tenant, the rent shall abate in proportion to the impairment of the use that Tenant can reasonably make of the Premises until the Premises are restored or until the Lease is terminated in accordance with this Paragraph.

15. Condemnation or Zoning. If part of the Premises is taken by eminent domain so that Tenant's business operation cannot be conducted or if the Premises is rezoned so that Tenant's operation of its business on the Premises is prohibited Tenant shall have the option to terminate this Lease Agreement by giving written notice to Landlord within forty-five (45) days after the taking or rezoning, and the rent will be adjusted as of the date Tenant's operation of its business is materially impaired or the termination date, whichever date is earlier. If the Premises are damaged or if access to the Premises is impaired by reason of such taking and Tenant does not elect to terminate this Lease Agreement, Landlord will promptly rebuild or repair the damage to the extent possible. All proceeds or condemnation awards for the property taken shall belong to Landlord only. In the event of condemnation and subsequent termination of this Lease Agreement, in addition to paying Tenant the unamortized prepaid rent, Tenant shall be entitled to receive, from the condemning authority an amount equal to its reasonable moving expenses, both into and away from the Lease Premises.

16. Tenants Liability Insurance. Tenant shall maintain and pay for public liability insurance against liability for accidents on the Premises with primary limits of coverage of not less than **One Million Dollars ($1,000,000.00)** for property damage and loss from anyone accident not less than **Five Hundred Thousand Dollars ($500,000.00)** for injury to any one person in any one accident. Landlord shall maintain its own liability insurance in the same amount that Tenant maintains according to the provisions of this paragraph.

17. Landlord's Remedies. If any rent required by this Lease Agreement shall not be paid within five (5) days after a written notice thereof has been given by Landlord to Tenant, Landlord may, in addition to the other remedies available to him at law, take any or all of the following actions:

(a) Terminate this Lease Agreement and resume possession of the Premises for his own account, and recover from Tenant the difference between the rent specified in this Lease Agreement and the fair rental value of the Premises for the remainder of the term, reduced to present value;

(b) Resume possession and release or rent the Premises for the remainder of the term for the account of Tenant and recover from Tenant at the end of the term the difference between the rent specified in this Lease Agreement and the rent received on the releasing or renting;

(c) Resume possession and exclude Tenant from the Premises, without terminating this Lease Agreement, until all unpaid rent is received;

(d) Enforce by distress, foreclosure, or otherwise, Landlords lien against Tenant's furniture, fixtures, goods and chattels.

Landlord shall not be required to issue written notice of default in rental payment in order to avail himself of the remedies provided in this paragraph if he has issued such notice within the previous six (6) months.

In case any rent is not paid when due and the same is collected by suit or through any attorney, Tenant agrees to pay Landlord for the attorney's fees incurred by Landlord together with all costs and charges thereof.

If either party shall fail to perform or shall breach any provision of this Lease Agreement (other than the agreement of Tenant to pay rent) for thirty (30) days after a written notice specifying the performance required shall have been given to the party failing to perform, the party giving notice may at its option terminate this Lease Agreement or bring an action in a court of competent jurisdiction to compel performance of this Lease Agreement.

Landlord may at his option by notice to Tenant terminate, this Lease Agreement effective immediately, if Tenant shall abandon the Premises, seek any protection under any bankruptcy, reorganization or arrangement, if an involuntary petition for such action is filed against Tenant and not discharged within thirty (30) days, or if Tenant shall make an assignment for the benefit of creditors.

18. Subordination. This Lease Agreement and the rights of Tenant are subordinate and inferior to any mortgage encumbering the Premises. Tenant shall promptly execute such instruments evidencing subordination, certificates of estoppels, and certificates as to the standing of this Lease Agreement as Landlord may reasonably request.

19. Rights of Successors. The terms and conditions of this Lease Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors or assigns.

20. Notices. All notices required under the terms of this Lease shall be given in writing and shall be complete by mailing such notices certified mail to the addresses below. A notice of change of address shall be given in the same manner. Notice shall be deemed given when deposited in the mail.

If to Tenant:
**FL Facilities Rental LLC**
5 River Road, Suite 211
Wilton, CT 06897
Telephone: 203-536-9407

If to Landlord:
**Brian Phillips Properties, LLC**
c/o Benchmark Asset Services
Kimberly Leroux
4348 Southpoint Boulevard, Suite 310
Jacksonville, FL 32216
Telephone: 904-421-8525

28

21. Real Estate Taxes. Landlord shall pay all ad valorem taxes and assessments levied or assessed against the office building in which the Premises are located. Tenant shall pay any taxes assessed against its property located within the Premises.

22. Exterior Signs. Tenant, at Tenant's sole expense, may emplace signage on the entry door to the Premises, subject to Landlord's final approval and on the building façade per City of Jacksonville sign ordinance.

23. Holding Over. Any holding over by Tenant after the termination of this Lease Agreement shall operate as a renewal of this Lease Agreement on a month to month basis at a rate one hundred fifty percent (150%) higher than the most recent monthly rate unless an agreement in writing providing otherwise is entered into by the parties hereto. Further, said month to month tenancy rental rate shall increase an additional one hundred fifty percent (150%) at each annual anniversary date thereafter. The month to month tenancy shall be terminated by written notice served at least 30 days in advance and may be terminated by either party.

24. Notice of Termination Not Required. No notice shall be required to terminate the original term of this Lease Agreement or option period hereof on the date herein specified, except that in the event Tenant becomes holdover tenant and is then on a month to month tenancy, any month to month tenancy must be terminated in writing with at least 30 days advance notice.

25. Modifications. No modification, alteration or amendment to this Lease Agreement shall be binding unless in writing and executed by the parties hereto, their heirs, successors or assigns.

26. Headings. The paragraph headings in this instrument are for convenience and reference only, and the words contained therein shall in no way be held to explain, amplify, modify, or aid in the interpretation, construction, or meaning of the provisions of this Lease Agreement.

27. Guaranty. The undersigned hereby covenants with Landlord that if default shall at any time be made by Tenant in the payment of rent, repairs, late fees or returned check fees, the undersigned will pay to Landlord, his personal representatives or assigns the past due rent or any arrears thereof, and all damages that may arise in consequence of any default by Tenant on receipt of written notice of such default from Landlord. This guaranty shall be in effect for the lease term.

28. Prior Negotiations. Entire Agreement. Neither Landlord or Tenant nor any of their agents have made any statements, representations or agreements verbally or in writing in conflict with the terms of this Lease Agreement. Any and all representations by either of the parties or their agents made during negotiations prior to the execution of this Lease Agreement and which representations are not contained in the provisions hereof, shall not be binding upon either of the parties hereto. This Lease Agreement contains the entire agreement between the parties, and no rights are to be conferred upon either party until this Lease Agreement has been executed.

29. Miscellaneous. (a) In the event any one or more of the provisions contained in this Lease shall for any reason to be held to be invalid, illegal, unconscionable or unenforceable in any respect, such invalidity, illegality, unconscionable or unenforceability shall not effect any other provision of this Lease but this Lease shall be construed as if such invalid, illegal, unconscionable or unenforceable provision had never been contained herein; and (b) except as provided by statue, the acceptance by Landlord of rent after it falls due or after knowledge of an breach of this Lease by Tenant or the giving of any notice making of any demand or any other act or waiver by Landlord other than a specific written waiver or election, shall not be construed as a waiver of any rights of Landlord under this Lease or as an election not to proceed under the provisions of this Lease. Notwithstanding any language to the contrary, as a condition precedent to this Lease, Landlord shall be permitted to conduct a credit check on Tenant and or background check. Landlord in Landlord's sole discretion may refuse to proceed with this Lease in connection with the credit and or background check to be conducted on Tenant. Tenant authorizes by signing this document that a credit check be conducted.

30. Landlord Work. Tenant requested and Landlord agreed that Landlord would make the following repairs to the property at Landlord's expense:

1. Remove interior door between Suite 101 & 102
2. Remove ceiling tiles
3. Remove door between office 1 & 2
4. Remove office 2 door
5. Assess HVAC system to assure reliability

Date: 9/18/19

Witness: ______________________

Witnesses: ______________________

Witnesses: ______________________

Date: ______________________

Witness: ______________________

**TENANT:**
**FL FACILITIES RENTAL, LLC**

By: ______________________
Print Name: John M. Stanise
Title: Manager

**PERSONAL GUARANTORS for paragraph 27 only:**

______________________
Print Name: John M. Stanise

______________________
Print Name: Dr. Victor Loria

**LANDLORD:**
**BRIAN PHILLIPS PROPERTIES, LLC**

By: ______________________
J. Brian Phillips, Manager



# EXHIBIT F

# ASSIGNMENT

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I/we the undersigned hereby sell, assign and transfer to:

Name: Lorstan Pharmaceutical, LLC
Address: 10773 NW 58th Street, Suite 751, Doral, FL 33178

its successors, assigns and legal representatives, all hereinafter referred to as the Assignee, my/our whole and entire right, title and interest, in and throughout the United States, its territories and all countries foreign thereto, in and to any and all invention(s) which are disclosed in the following Application:

U.S. Patent Application Serial No.: 15/405,240
Title: SILICONE OIL-IN-WATER COMPOSITION USEFUL AS AN INJECTABLE FILLER AND AS A SCAFFOLD FOR COLLAGEN GROWTH
Filed: January 12, 2017
Attorney Docket No: L1225/20001

and any improvements thereon which I/we make, conceive or acquire during the course of my/our association with Assignee, and for one year thereafter, and in and to said Application and any and all Letters Patent and extensions thereof of the United States and countries foreign thereto which have been or may be granted on said invention(s) or any part thereof, or any improvements thereon or on said Application, or any divisional, continuing, renewal, reissue, or other application and all international priority rights associated therewith, based in whole or in part thereon, or based upon said invention(s), or any improvements thereon.

I/We agree that said Assignee may apply for and receive Letters Patent for said invention(s) in its own name; and when requested, without charge to, but at the expense of said Assignee, I/we agree to carry out in good faith the intent and purpose of this assignment by executing all divisional, continuing, substitute, renewal, reissue, and all other patent applications on any and all said invention(s), by executing all rightful oaths, assignments, powers of attorney and other papers, by communicating to said Assignee all facts known to me/us relating to said invention(s) and the history thereof, and generally by doing everything possible which said Assignee shall consider desirable for aiding in securing and maintaining proper patent protection for said invention(s) and for vesting title to said invention(s) and all applications for patents and all patents on said invention(s), in said Assignee.

I/We hereby request the Honorable Commissioner of Patents and Trademarks to issue said Letters Patent to said Assignee.

I/We covenant with said Assignee that no assignment, grant, mortgage, license or other agreement affecting the rights and property herein conveyed has been, or will be, made to others by me/us, and that full right to convey the same as herein expressed is possessed by me/us.

I/We hereby authorize said Assignee to insert on this Assignment the serial number and filing date of the above-identified application when they become available.

1-5-17

Attorney Docket No. L1225/20001

IN WITNESS WHEREOF, having read the aforesaid Assignment and intending to be legally bound thereby, I have hereunto affixed my hand and seal on this

5 day of January, 2017
(day) (month) (year)

Name: Victor LORIA
Address: 3625 NW 82nd Ave
STE 402
Miami, FL 33166

STATE/COMMONWEALTH OF Florida :
SS :
COUNTY OF Miami-Dade :

Before me, a notary public, in and for the State/Commonwealth and County aforesaid, on this

5 day of January, 2017
(day) (month) (year)

personally appeared Victor Loria

who being to me personally known, and who having first executed the foregoing instrument in my presence and having been by me first duly sworn, did acknowledge the foregoing instrument as his/her free deed and act, signed, sealed and delivered by him/her for the purpose therein stated and intending to be legally bound thereby and intending that said instrument be recorded.

(SEAL)
NOTARY PUBLIC

JASMINE V. BURKHOLDER
MY COMMISSION # FF 101446
EXPIRES: April 26, 2018
Bonded Thru Budget Notary Services

My Commission Expires: 8/26/2018

# EXHIBIT G

2

651113

Schedule K-1 (Form 1065) **2016**

Department of the Treasury
Internal Revenue Service

For calendar year 2016, or tax year beginning JUNE 20, 2016 ending DECEMBER 31, 2016

**Partner's Share of Income, Deductions, Credits, etc.** ▶ See separate instructions.

☐ Final K-1 ☐ Amended K-1 OMB No. 1545-0123

## Part I Information About the Partnership

**A** Partnership's employer identification number
[redacted]2280

**B** Partnership's name, address, city, state, and ZIP code

LORSTAN PHARMACEUTICAL LLC
10773 NW 58TH STREET, STE 751
DORAL, FL 33178

**C** IRS Center where partnership filed return
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II Information About the Partner

**E** Partner's identifying number
[redacted]-4886

**F** Partner's name, address, city, state, and ZIP code

VICTOR LORIA, MD
[redacted]
DORAL, FL [redacted]

**G** [X] General partner or LLC member-manager ☐ Limited partner or other LLC member

**H** [X] Domestic partner ☐ Foreign partner

**I1** What type of entity is this partner? INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 70.0000000% | 70.0000000% |
| Loss | 70.0000000% | 70.0000000% |
| Capital | 70.0000000% | 70.0000000% |

**K** Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse | $ |
| Qualified nonrecourse financing | $ |
| Recourse | $ 0. |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 0. |
| Capital contributed during the year | $ 35,000. |
| Current year increase (decrease) | $ 0. |
| Withdrawals & distributions | $( ) |
| Ending capital account | $ 35,000. |

[X] Tax basis ☐ GAAP ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes [X] No
If "Yes," attach statement (see instructions)

## Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Item | Amount |
|---|---|
| 1 Ordinary business income (loss) | 0. |
| 2 Net rental real estate income (loss) | |
| 3 Other net rental income (loss) | |
| 4 Guaranteed payments | |
| 5 Interest income | |
| 6a Ordinary dividends | |
| 6b Qualified dividends | |
| 7 Royalties | |
| 8 Net short-term capital gain (loss) | |
| 9a Net long-term capital gain (loss) | |
| 9b Collectibles (28%) gain (loss) | |
| 9c Unrecaptured sec 1250 gain | |
| 10 Net section 1231 gain (loss) | |
| 11 Other income (loss) | |
| 12 Section 179 deduction | |
| 13 Other deductions | |
| 14 Self-employment earnings (loss) | A 0. |
| 15 Credits | |
| 16 Foreign transactions | |
| 17 Alternative min tax (AMT) items | |
| 18 Tax-exempt income and nondeductible expenses | |
| 19 Distributions | |
| 20 Other information | |

*See attached statement for additional information.

For IRS Use Only

651117

Schedule K-1 (Form 1065)
Department of the Treasury
Internal Revenue Service

**2017**

For calendar year 2017, or tax year beginning ______ ending ______

**Partner's Share of Income, Deductions, Credits, etc.** ▶ See separate instructions.

☐ Final K-1 ☐ Amended K-1 OMB No. 1545-0123

## Part I Information About the Partnership

A Partnership's employer identification number
[redacted]2280

B Partnership's name, address, city, state, and ZIP code
LORSTAN PHARMACEUTICAL LLC
10773 NW 58TH STREET, STE 751
DORAL, FL 33178

C IRS Center where partnership filed return
E-FILE

D ☐ Check if this is a publicly traded partnership (PTP)

## Part II Information About the Partner

E Partner's identifying number
[redacted]-4886

F Partner's name, address, city, state, and ZIP code
VICTOR LORIA, MD
[redacted]
DORAL, FL [redacted]

G [X] General partner or LLC member-manager ☐ Limited partner or other LLC member

H [X] Domestic partner ☐ Foreign partner

I1 What type of entity is this partner? INDIVIDUAL

I2 If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

J Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 70.0000000% | 70.0000000% |
| Loss | 70.0000000% | 70.0000000% |
| Capital | 70.0000000% | 70.0000000% |

K Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse | $ |
| Qualified nonrecourse financing | $ |
| Recourse | $ 0. |

L Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 35,000. |
| Capital contributed during the year | $ 41,167. |
| Current year increase (decrease) | $ -11,894. |
| Withdrawals & distributions | $( ) |
| Ending capital account | $ 64,273. |

[X] Tax basis ☐ GAAP ☐ Section 704(b) book
☐ Other (explain)

M Did the partner contribute property with a built-in gain or loss?
☐ Yes [X] No
If "Yes," attach statement (see instructions)

## Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | |
|---|---|
| 1 Ordinary business income (loss) | -11,894. |
| 2 Net rental real estate income (loss) | |
| 3 Other net rental income (loss) | |
| 4 Guaranteed payments | |
| 5 Interest income | |
| 6a Ordinary dividends | |
| 6b Qualified dividends | |
| 7 Royalties | |
| 8 Net short-term capital gain (loss) | |
| 9a Net long-term capital gain (loss) | |
| 9b Collectibles (28%) gain (loss) | |
| 9c Unrecaptured sec 1250 gain | |
| 10 Net section 1231 gain (loss) | |
| 11 Other income (loss) | |
| 12 Section 179 deduction | |
| 13 Other deductions | |
| 14 Self-employment earnings (loss) | A -11,894. |
| 15 Credits | |
| 16 Foreign transactions | |
| 17 Alternative min tax (AMT) items | |
| 18 Tax-exempt income and nondeductible expenses | |
| 19 Distributions | |
| 20 Other information | |

*See attached statement for additional information.

For IRS Use Only

651118

Schedule K-1 (Form 1065)
Department of the Treasury
Internal Revenue Service

**2018**

For calendar year 2018, or tax year beginning ____ ending ____

**Partner's Share of Income, Deductions, Credits, etc.**

▶ See separate instructions.

☐ Final K-1 ☐ Amended K-1 OMB No. 1545-0123

## Part I Information About the Partnership

A Partnership's employer identification number
[redacted]2280

B Partnership's name, address, city, state, and ZIP code
LORSTAN PHARMACEUTICAL LLC
5 RIVER ROAD, SUITE 211
WILTON, CT 06897

C IRS Center where partnership filed return
E-FILE

D ☐ Check if this is a publicly traded partnership (PTP)

## Part II Information About the Partner

E Partner's identifying number
[redacted]-4886

F Partner's name, address, city, state, and ZIP code
VICTOR LORIA, MD
[redacted]
DORAL, FL [redacted]

G [X] General partner or LLC member-manager ☐ Limited partner or other LLC member

H [X] Domestic partner ☐ Foreign partner

I1 What type of entity is this partner? INDIVIDUAL

I2 If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

J Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 70.0000000% | 70.0000000% |
| Loss | 70.0000000% | 70.0000000% |
| Capital | 70.0000000% | 70.0000000% |

K Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ 0. | $ 0. |

L Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 64,273. |
| Capital contributed during the year | $ 120,000. |
| Current year increase (decrease) | $ -111,836. |
| Withdrawals & distributions | $( ) |
| Ending capital account | $ 72,437. |

[X] Tax basis ☐ GAAP ☐ Section 704(b) book
☐ Other (explain)

M Did the partner contribute property with a built-in gain or loss?
☐ Yes [X] No
If "Yes," attach statement (see instructions)

## Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Item | Code | Amount |
|---|---|---|
| 1 Ordinary business income (loss) | | -111,821. |
| 2 Net rental real estate income (loss) | | |
| 3 Other net rental income (loss) | | |
| 4 Guaranteed payments | | |
| 5 Interest income | | |
| 6a Ordinary dividends | | |
| 6b Qualified dividends | | |
| 6c Dividend equivalents | | |
| 7 Royalties | | |
| 8 Net short-term capital gain (loss) | | |
| 9a Net long-term capital gain (loss) | | |
| 9b Collectibles (28%) gain (loss) | | |
| 9c Unrecaptured sec 1250 gain | | |
| 10 Net section 1231 gain (loss) | | |
| 11 Other income (loss) | | |
| 12 Section 179 deduction | | |
| 13 Other deductions | | |
| 14 Self-employment earnings (loss) | A | -111,821. |
| 15 Credits | | |
| 16 Foreign transactions | | |
| 17 Alternative min tax (AMT) items | | |
| 18 Tax-exempt income and nondeductible expenses | C* | 15. |
| 19 Distributions | | |
| 20 Other information | Z * | -111,821. |
| | AA * | 3,419. |
| | AB * | 6,152. |
| | AC * | 0. |
| | AD * | 0. |

*See attached statement for additional information.

For IRS Use Only

LORSTAN PHARMACEUTICAL LLC ████2280

SCHEDULE K-1 NONDEDUCTIBLE EXPENSES, BOX 18, CODE C

| DESCRIPTION | PARTNER FILING INSTRUCTIONS | AMOUNT |
|---|---|---|
| EXCLUDED MEALS AND ENTERTAINMENT EXPENSES | NONDEDUCTIBLE PORTION | 15. |
| TOTAL TO SCHEDULE K-1, BOX 18, CODE C | | 15. |

SCHEDULE K-1 SECTION 199A ITEMS, BOX 20 CODES Z THROUGH AD

| CODE | DESCRIPTION | AMOUNT |
|---|---|---|
| | TRADE OR BUSINESS - | |
| Z | SECTION 199A QUALIFIED BUSINESS INCOME * | -111,821. |
| | * INCLUDED | |
| | ORDINARY INCOME(LOSS) | -111,821. |
| | * NOT INCLUDED | |
| | SELF-EMPLOYMENT EARNINGS(LOSS) | -111,821. |
| AA | SECTION 199A W-2 WAGES | 3,419. |
| AB | SECTION 199A UNADJUSTED BASIS | 6,152. |
| AC | SECTION 199A REIT DIVIDENDS | 0. |
| AD | SECTION 199A PTP INCOME | 0. |

LORSTAN PHARMACEUTICAL LLC

2280

SCHEDULE K-1 SECTION 199A ADDITIONAL INFORMATION

THE SECTION 199A AMOUNTS TO BE USED IN THE CALCULATION OF QUALIFIED BUSINESS INCOME DEDUCTION ON YOUR 1040/1041 RETURN ARE REPORTED ON LINE 20, UNDER CODES Z, AA, AB, AC AND AD. THE CHARITABLE CONTRIBUTIONS, INVESTMENT INTEREST EXPENSE, DEDUCTIONS - ROYALTY INCOME, SECTION 59(E)(2) EXPENDITURES AND DEDUCTIONS - OTHER PORTFOLIO AMOUNTS ARE NOT INCLUDED IN THE CALCULATION OF THE QUALIFIED BUSINESS INCOME AMOUNT UNDER CODE Z. PLEASE CONSULT YOUR TAX ADVISOR REGARDING THE CALCULATION OF THE QUALIFIED BUSINESS INCOME DEDUCTION, INCLUDING THE POSSIBLE AGGREGATIONS AND LIMITATIONS THAT MAY APPLY AND THE FILING OF THE 1.199A-4(C)(2)(I) ANNUAL DISCLOSURE STATEMENT.